UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA

                                :

             -against-          :       Ind. No.: 07 CR 822 (SCR)

                                :

HECTOR BARRERAS

            Defendant.
-----------------------------------------------------------X

DEFENDANT"S POST HEARING MEMORANDOM OF LAW

LAWRENCE M. FISHER
Attorney for Defendant
350 Broadway – 10th floor
New York, N.Y.  10013
(212) 226-5700

## **TABLE OF CONTENTS**

**PAGE**

HEARING OVERVIEW                                                    6

DISPUTED FACT: HANSEN WAS ALONE IN THE PARKING LOT       10

DISPUTED FACT: BARRERAS WAS NOT WEARING A SEATBELT       18

THE STOP OF THE TOYOTA                                             22

CONSENT / PROLONGED DETENTION                                     27

MIRANDA                                                           40

## TABLE OF CASES

### United States Supreme Court

*Bringham City v. Stuart*, 547 U.S. __, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).

*Muelher v. Mena*, 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005)

*Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed2d 842 (2005)

*Hilbert v. Sixth Judicial District Ct.*, 542 U.S. 177, 188, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)

*United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)

*United States v. Knights*, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001)

*Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)

*Wyoming v. Houghton*, 526 U.S. 295, 298, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)

*Knowles v. Iowa*, 525 U.S.113, 117, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998)

*Minnesota v. Carter*, 525 U.S. 83, 85, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)

*Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)

*Whren v. United States*, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)

*Thompson v. Keohane*, 516 U.S. 99, 102, 116 S.Ct. 547, 133 L.Ed.2d 383 (1995)

*Florida v. Bostick*, 501 U.S. 429, 434 , 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)

*California v. Hodari D.*, 499 U.S. 621, 111 S.Ct 1547, 113 L.Ed.2d  690 (1991)

*New York v. Harris*, 495 U.S.14, 24, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990)

*Smith v. Ohio*, 494 U.S. 541, 542, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990)

*United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)

*California v. Carney*, 471 U.S. 386, 394, 105 S.Ct. 2066, 2071, 85 L.Ed2d 406 (1985)

*United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)

*California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988)

*United States v. Montoya de Hernandez*, 473 U.S. 531, 542, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)

*United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)

*Berkemer v. McCarty*, 468 U.S. 420, 439 n.29, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)

*United States v.  Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)

*Florida v. Royer*, 460 U.S. 491, 507-08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)

*Taylor v. Alabama*, 457 U.S. 685, 690 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982)

*Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct.1880, 68 L.Ed.2d 378 (1981)

*United States v. Salvucci*, 488 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980)

*Rawlings v. Kentucky*, 448 U.S. 98, 104-05, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980)

*Ybarra v. Illinois*, 444 U.S. 83, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), *rehear. denied*, 444 U.S. 1049, 100 S.Ct. 741 (1980)

*Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)

*Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)

*Delaware v. Prouse*, 440 U.S. 648, 653-54, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)

*United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)

*Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975)

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.25 (1973)

*Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct.1868, 20 L.Ed.2d 889 (1968)

*Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)
*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)
*Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)
*Jones v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 734, 4 L.Ed.2d 697 (1960)
*Yick Wo v. Hopkins*, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 1072-73, 30 L.Ed.2d 220 (1886)

## 2nd Circuit (Cert. Denied)

*United States v. Snype*, 441 F.3d 119, 130 (2nd Cir.), *cert. denied*, 166 L.Ed.2d 218, 2006 U.S.Lexis 6297 (2006)

*United States v. Swindle*, 407 F.3d 562, 566 (2nd Cir.), *cert. denied*, 546 U.S. 913, 126 S.Ct. 279, 163 L.Ed.2d 247 (2006)

*Brown v. City of Oneota*, 195 F.3d 111 (2nd Cir.), *supercided by*, 221 F.3d 329 (2nd Cir.), *cert. denied*, 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001)

*United States v. Elliot*, 50 F.3d 180, 185 (2nd Cir.), *cert. denied*, 516 U.S. 1060, 116 S.Ct. 715, 133 L.Ed.2d 669 (1997)

*United States v. Scopo*, 19 F.3d 777, 781-82 (2nd Cir.), *cert. denied*, 513 U.S. 877, 115 S.Ct.207, 130 L.Ed.2d 136 (1994)

*United States v. Paulino*, 850 F.2d 93, 96 (2nd Cir.1988), *cert. denied*, 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989)

*United States v. Alvarez-Porras*, 643 F.2d 54, 59 (2nd Cir.1981), cert. denied, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981)

## 2nd Circuit

*United States v. Awadallah*, 202 F.Supp.2d 82 (S.D.N.Y.), *rev'd. on other grounds*, 439 F.3d 42 (2003)

*Holeman v. City of New London*, 425 F.3d 184, 189 (2nd Cir.2005)

*United States v. Haqq*, 278 F.3d 44 (2nd Cir.2002)

*United States v. Tehrani*, 49 F.3d 54, 61 (2nd Cir.1994)

*United States v. Jaramillo*, 25 F.3d 1146, 1153 (2nd Cir.1994)

*States v. Glover*, 957 F.2d 1004, 1011 (2nd Cir.1992)

*United States v. Ponce*, 947 F.2d 646 (2nd Cir.1991)

*United States v. Montilla*, 928 F.2d 583 (2nd Cir.1991)

*United States v. Wong Ching Hing*, 867 F.2d 754 (2nd Cir.1989)

*United States v. Ceballos*, 812 F.2d 42, 50 (2nd Cir.1987)

*United States v. Ochs*, 595 F.2d 1247, 1253 (2nd Cir.1979)

<u>S.D.N.Y.</u>

*United States v. Cook*, 348 F.Supp.2d 22 (S.D.N.Y.2004)

*United States v. Robles*, 253 F.Supp.2d 544 (S.D.N.Y. 2002)

*United States v. Ferguson*, 130 F.Supp.2d 560, 565 (S.D.N.Y. 2001)

<u>E.D.N.Y.</u>

*United States v. Restrepo*, 890 F.Supp. 180, 196 (E.D.N.Y.1995)

<u>W.D.N.Y.</u>

*United States v. Mire*, 851 F.Supp. 96, 105 (W.D.N.Y.1994), *rev'd on other grounds*,  51 F.3d 349 (2nd Cir.1995)

<u>5th Circuit (Cert. Denied).</u>

*United States v. Crain*, 33 F.3d 480, 485 (5th Cir.), *cert. denied*, 115 S.Ct. 1142 (1995)

<u>7th Circuit (Cert. Denied)</u>

*United States v. Green*, 111 F.3d 515, 520 (7th Cir.), *cert. denied*, 522 U.S. 973, 118 S.Ct. 427, 139 L.Ed.2d 328 (1997)

<u>10th Circuit (Cert. Denied)</u>

*United States v. Martinez*, 983 F.2d 968, 976 (10th Cir.), cert. denied, 508 U.S. 922, 113 S.Ct. 2372, 124 L.Ed.2d 277 (1993)

<u>10th Circuit (Cert. Denied) (continued)</u>

*United States v. Walker*, 933 F.2d 812 (10th Cir.), *rehear. den*., 941 F.2d 1086, *cert. denied*, 502 U.S. 1093 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992)

<u>1st Circuit</u>

*United States v. Kimball*, 25 F.3d 1 (1st Cir.1994)

<u>3rd Circuit</u>

*Virgin Islands v. Edwards*, 903 F.2d 267, 273 (3rd Cir.1990)

<u>4th Circuit</u>

*United States v. Soriano-Jarquin*, 492 F.3d 495, 501 (4th Cir.2007)

<u>5th Circuit</u>

*United States v. Rodriguez-Flores*, 249 Fed. Appx. 317, 320 (5th Cir.2007)
*United States v. Campos*, 237 Fed. Appx. 949, 954 (5th Cir.2007)
*United States v. Shabazz*, 993 F.2d 431 (5th Cir.1993)

<u>6th Circuit</u>

*United States v. Mesa*, 62 F.3d 159 (6th Cir.1995)

<u>10th Circuit</u>

*United States v. Stewart*, 473 F.3d 1256, 1269 (10th Cir.2007)
*United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir.2006)

<u>11th Circuit</u>

*United States v. Miller*, 821 F.2d 546 (11th Cir.1987)

<u>Illinois Supreme Court</u>

*People v. Cox*, 202 Ill.2d 462, 782 N.E.2d 275 (Sup. Ct. Ill.2002)

<u>Hearing Overview</u>

SA Kadan (hereinafter "Kadan") testified that he is a DEA Agent currently working for the Westchester County Task Force. He works on narcotics crimes. Suppression Hearing Transcripts p.13 (T-13). On the night of July 23, 2007, he was conducting surveillance on a building, 808 Tuckahoe Road, for which the DEA believed lived a suspect that they had earlier unsuccessfully tried to apprehend. (T-18).

Kadan's current "position was going to be on foot-post in front of 808 Tuckahoe Road in the event [the suspect] came back to the residence" because "other agents [were] following [the suspect's wife] to see if she would meet with [her husband] somewhere else" (T-17).[1]

Kadan testified that he spoke with Hansen over the phone and informed Hansen why they were conducting surveillance on 808 Tuckahoe Road,[2] although he did not meet up with Hansen that night until Hansen "pulled up in [Hansen's] vehicle, yelled at me to get off the phone … we got to follow the white Avalon that's in front of us and pull it over." (T-18).

Kadan testified that when TFO Hansen (hereinafter "Hansen") pulled up to him and told him to get in the car, Hansen began to describe to Kadan, Hansen's observation

---

[1] As Kadan also testifies that and "my guys, the guys in my group left to follow the wife." (T-37). As Hansen also testified that they were to only surveillance team and had to watch 808 Tuckahoe Road in case the suspect returned, (T-93).

[2] However, Hansen testified that Hansen "was trying to get in touch with members of the group to see what was going on" but on the way to the location he did get through to his supervisor who advised him of what was happening at the location (T-84) and further states he was still trying to "get a hold of somebody" from the team after he saw defendant. (T-89).

of a white Toyota Avalon (hereinafter "Toyota") in the parking lot located in the rear of 808 Tuckahoe Road that looked **_suspicious_** every time Hansen passed by.[3] Suspicious was the conclusory language used by Hansen.

With regards to Hansen's testimony, he is also assigned to the Westchester DEA Task Force and his job is to conduct "high level narcotics investigations" (T-83) and he was working in plainclothes. (T-114). That on July 23, 2007, he had received a voice mail and upon retrieving his message he realized that it was from "[his] supervisor, Jay Flaherty … to respond to 808 Tuckahoe, that they needed [him] right away." (T-83-84).

As described in _footnote #2_ Hansen testified that he was unsuccessful in reaching a surveillance member (namely Kadan) by phone or radio[4] although he admits that they had "Motorola two-way radios" where "we have our own frequency, the DEA does" (T-106). Hansen did get more details about the 808 Tuckahoe Road location from his supervisor whom he successfully reached as he was going to the surveillance location. (T-84).

Hansen testified that when he arrived he was unsuccessful in finding anyone for the surveillance group in the "immediate area [and] all the side streets around 808 Tuckahoe" and saw "none of our guys, no police officers." (T-85) Hansen was still trying to "get a hold of somebody" after he saw defendant. (T-89).

---

[3] Also confirmed by Hansen on T-83.

[4] And only made contact with a member of the team (Kadan) after following the Toyota by "turn[ing] and going down Tuckahoe Road, Hansen looked up and saw Kadan standing on the sidewalk … talking on the cell phone." (T-92).

Hansen testified that while driving around looking for the team his attention was drawn to the parking lot behind 808 Tuckahoe Road because he noticed a van parked in the lot which he thought may have belonged to Kadan (T-85) and to a white Toyota parked close to the entrance in a parking space (T-86) parked in the "second [parking] space in." (T-115).[5]

Hansen testified that the van was parked "further in these spaces." Using the video, Hansen actually pointed to an area that was out of video view, way down in the inner most part of the parking lot (T-90) that did not depict any such van, if such a van even existed.

The only thing Hansen could have actually seen was the defendant, as he was walking in the parking lot towards the Toyota. The defendant was only in the parking lot for a total of 2 minutes and 1 second, which includes walking across the lot to the Toyota, getting into the Toyota, waiting for the officers to exit, after having completed the u-turn, and defendant driving out.

Hansen claims that after he made the u-turn in the parking lot and exited it by making a right onto Cross Street, that he went "a 100 feet down" Cross Street (T-110) "made a u-turn, blacked out [his] car," and parked across the street and was only sitting there less than 1 minute before the defendant exited the parking lot. (T-107-108). He also

---

[5] It makes no sense that his attention would be drawn to an unoccupied Toyota that he was not even looking for, when there were at least ten other vehicles also parked in the parking lot.

indicated that it took him less than 1 minute from the time he exited the parking lot by making a right on to Cross Street and parked his car across the street. (T-108).

Hansen also testified that when he exited the parking lot, made the u-turn, blacked out his lights, and parked across the street that he was "trying to get a hold of [Kadan] to get a description" of the person they were looking for as it "had crossed [Hansen's] mind that the defendant could have been the suspect." (T-88-89).

Hansen testified that when the Toyota exited the parking lot, he proceeded "directly behind the [Toyota] at the red light … the light turned green the Toyota made a left turn on Tuckahoe Road, heading westbound, [I followed it] and was still trying to get a hold of Kadan … as we made the turn … I looked up and saw Kadan standing on the sidewalk … talking on his cell phone … I pulled over and yelled … get off the phone, get in the car with me, I want to stop this car." (T-92-93).

Hansen testified under oath that that he was ***alone*** in his car when he had been dispatched to assist at 808 Tuckahoe Road, that he was also ***alone*** when he made the u-turn at the back of the parking lot and he remained ***alone*** the entire time prior to picking up Kadan. (T-104). Hansen further testified that Kadan entered Hansen's vehicle and that Kadan got into the front passenger seat which had previously been empty. (T-112-113).

Hansen testified that he explained what he had observed to Kadan and that he wanted Kadan to see if the defendant was the suspect and that he also wanted to stop the car because they were the only surveillance team and had to watch 808 Tuckahoe Road in case the suspect returned, (T-93), but that Kadan only wanted to see if the defendant was the suspect and if not [Kadan] wanted to follow the Toyota. (T-93).

### Disputed Fact : Hansen Was Alone in The Parking Lot

A major fact in dispute is that both Kadan and Hansen each claim not to have been with each other during the time Hansen claimed to have entered and exited the parking lot. However, it is clear from the video that Hansen was not alone when he entered and exited the parking lot, but rather there was a second person in his car seated in the front passenger seat. This is clearly indicated in the video at 22:51:17 – 22:51:21.

Although the video does not clearly show the face of the person in the front passenger seat, it clearly demonstrates that someone was sitting in the front passenger seat wearing a white shirt and wearing a seatbelt. It is submitted that it is likely Kadan who was the person seated in the front passenger seat. Kadan had longer hair then.  Both Hansen and Kadan testified during the Suppressing Hearing that Hansen was by himself until he began to follow the defendant.  Hansen also testified that as Kadan entered Hansen's vehicle, Kadan got into the front passenger seat which had previously been empty. (T-112-113).

This "factual support" shows that neither of the officers that testified under oath at the Suppression Hearing were credible. They both demonstrated "deliberate falsehood [and] reckless disregard for the truth." *United States v. Cook*, 348 F.Supp.2d 22, 30 (S.D.N.Y.2004) ("Defendant has not alleged any deliberate falsehood or reckless disregard for the truth and has not offered any legal or factual support for the allegations that he does make").

Hansen demonstrated a total disregard for the truth and knowingly testified falsely when he testified to the following:

1) that when Hansen drove by the entrance of the parking lot that he was by himself[6] because he was not able to find anyone from the surveillance team.

2) that Hansen was still trying to reach Kadan that while trying to locate Kadan when he noticed a van parked in the inner most part of the parking lot behind 808 and drove in to the parking lot looking for Kadan, but when he reached the van he saw it was not Kadan's and therefore was still unable to locate or reach Kadan;

3) that while Hansen exited the parking lot that he was still unsuccessfully trying to reach Kadan;

4) that when Hansen made a left on Tuckahoe Road to proceed westbound, behind the Toyota, that was when he first saw Kadan talking on his cell phone and testified how Kadan got in to the front passenger seat; which had previously been empty;

---

[6] When Hansen drives into the parking lot he is going north on Cross Street (which means he is not on Tuckahoe Road where he allegedly finds Kadan) and therefore he was already with him when he drove by the entrance of the parking lot and noticed the defendant.

5) that Hansen stopped to pick up Kadan and explained to him what he had just

became  suspicious of in the parking lot behind 808 Tuckahoe Road;

6) how Hansen explains to the Court how he wanted to show Kadan the defendant

Toyota so that Kadan could see if the defendant was the suspect that was the

target of their surveillance.

Kadan testified that he wrote a lengthy factual report (DEA-6) about this incident,

however, Hansen testified that he did not.

Kadan demonstrated a total disregard for the truth and falsely prepared his report

when he wrote the following:

1) "TFO Hansen [was by himself and] drove south on Cross Street and noticed

that a white in color Toyota Avalon was parked with its driver looking at TFO Hansen as

he drove by."

2) "TFO Hansen [by himself] then entered the parking lot just behind 808

Tuckahoe Road.,"

3) that "TFO Hansen [by himself] drove to the end of the parking lot, turned

around, and came back to Cross Street."

4) Hansen "picked up SA Kadan who was on foot walking westbound on the

north side of Tuckahoe Road."

5) that "TFO Hansen told SA Kadan that there was a suspicious subject in a

white Toyota Avalon parked behind building 808 Tuckahoe."

6) that at the time "SA Kadan told TFO Hansen that building 808 Tuckahoe Road was the address for [the suspect they were looking for]."

This basically conformed with his testimony at the Suppression Hearing when he falsely testified that he met up with Hansen that evening when "I was on the sidewalk on the telephone in front of 808 Tuckahoe Road [a]nd as I was walking on the sidewalk, Hansen pulled up in [Hansen's] vehicle, yelled at me to get off the phone, I got in the car and [Hansen] said get off the phone we got to follow this [Toyota] in front and pull that [Toyota] over … I asked why?" (T-18).

Furthermore, Kadan testified that 1) he never encountered the defendant until the vehicle stop (T-29); and 2) he first noticed that the defendant at the traffic light on Tuckahoe Road and Central Ave (T-37) (T-58).  Although Kadan was given ample opportunity on cross examination to come clean about this fabrication that he was telling the Court, he instead testified to the following: (T-68-69):

> THE COURT: This is not the outside door that I'm looking at, this is the interior door.
>
> KADAN: This is [the] interior camera.
>
> FISHER: In the lobby?
>
> KADAN: Yes, in the lobby, it's a very small lobby.
>
> THE COURT: you can continue.
>
> FISHER: You don't recall observing this at all?
>
> KADAN: I definitely didn't observe this.
>
> FISHER: It's a clear glass door in a well lit lot.

14

THE COURT: Here's [were] you got in trouble with me before.  He already testified that he never saw [the defendant] before [the defendant] was in the automobile.  We're looking at video of [the defendant] before the point of [the defendant] being in the automobile.  Is that correct?

FISHER: Right, that's - -

THE COURT: Let me just –

FISHER: I'm going to connect them.
THE COURT: Agent Kadan, let me just tell you if looking at any of this film refreshes your recollection that you actually saw [the defendant] prior to the period that you testified you saw him please let us know …

KADAN: I will, your honor.

THE COURT: Let's go

After a few other questions it continues: (T-70-71)

FISHER: That's [the defendant] just exiting the front door back out on to Tuckahoe Road, right?

KADA: From what the video is showing, I believe that's correct, yes.  He's carrying a bag in his left hand.

FISHER: Now, do you recall seeing [the defendant] carrying this - -[7]

THE COURT: Okay.  Time out.  We're going to break for lunch because you're making ---

THE COURT: This is now the third time I'm telling you [Kadan] has testified he never saw [the defendant] before [the defendant] was in the car [at the car stop] … I instructed [Kadan] that if any of this refreshes his recollection that he actually saw [the defendant] he is to tell us that … you understood me to ask you that, isn't that correct?

KADAN : Yes, your Honor

THE COURT: You said under oath that you're going to do that, isn't that correct?

KADAN: Yes, I did.

---

[7] This line of questioning was going to see if Kadan would admit that Kadan and Hansen were both in the car as their car passed in front of the building when the defendant exited the building … as will be described in further detail below with regard to the video depiction at 22:49:29

<u>THE COURT: He told us that if it refreshes his recollection he will pipe up and
correct his testimony.</u>

As Kadan viewed the video, Kadan should have "corrected his testimony" as it is
obvious he was lying about not seeing the defendant until the actual car stop.

This demonstrates Kadan's total "deliberate falsehood [and] disregard for the
truth" *Cook*, 348 F.Supp.2d, at 30.  It demonstrates that Kadan has no problem with
violating a citizens rights then going into court and attempting to get away with it by
lying.

Defendant contents that the officers had already seen Barreras and knew that he
was not the short balding Hispanic male suspect that the surveillance had been set up for.
Otherwise, if they really did not see the defendant then they would not have had to go to
such extremes to knowingly falsify the DEA-6 and lie under oath in order to create a
plausible story of Hansen being by himself and not knowing what the suspect of the
surveillance looked like in an attempt to justify a reason to follow the Toyota.

It is not disputed that the defendant was the driver and sole occupant of the
Toyota that had been parked in the parking lot of a three building complex, in a position
directly behind 808 Tuckahoe Road.

 The three building complex consisted of three individual buildings, 790
Tuckahoe Road - 800 Tuckahoe Road - 808 Tuckahoe Road, and they all shared the same

common parking lot as it was in the back of this three building complex, with the 790

building being furthest to the east.[8]


The defendant had come out of 790 Tuckahoe Road which is two buildings away

from 808 Tuckahoe Road, the building that the officers knew the suspect that they were

looking for lived in. The officers testified that the defendant was not in anyway

connected with their suspect.  The defendant exited 790 Tuckahoe Road and made a left

which means that the defendant proceeded west as supported by the video in evidence.


A reasonable suspicion that criminality is afoot is not created where "officers had

merely observed an unidentified black [as suspect they were looking for was also black]

drive up to the drug house in a [model type of car the police associated with the suspect

they were looking for], enter a house, leave a short while later and then drive away." In

*United States v. Swindle*, 407 F.3d 562, 569 (2nd Cir.), *cert. denied*, 546 U.S. 913, 126

S.Ct. 279, 163 L.Ed.2d 247 (2006).


The *Swindle* Court as cited two Supreme Court cases and a 7th Circuit Court of

Appeals case which are as follows:  *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct.

673, 145 L.Ed.2d 570 (2000) (an individual's presence in an area of expected criminal

activity, standing alone, is not enough to support a reasonable, particularized suspicion

that the person is committing a crime"); *Brown v. Texas*, 443 U.S. 47, 52,  99 S.Ct. 2637,

61 L.Ed.2d 357 (1979) (finding no reasonable suspicion where defendant was observed in

---

[8] Kadan testified at the Suppression Hearing p. 64 (T-p.64) "[from the view of the camera] we're looking in
an eastbound direction … it's 790 is [] closest to us, 600, and then 808."  And again at T-38 "790 and 808
is two buildings to the east."

alley in neighborhood known for drug dealing and where police merely claimed that situation "looked suspicious"); *United States v. Green*, 111 F.3d 515,  (7th Cir.), *cert. denied*, 522 U.S. 973, 118 S.Ct. 427, 139 L.Ed.2d 328 (1997) ("That on one occasion a car parked on the street in front of a house where a fugitive resides is insufficient to create a reasonable suspicion that a car's occupant had been or are about to engage in criminal activity"); see also *United States v. Jaramillo*, 25 F.3d 1146, 1152 (2nd Cir.1994) ("The sole fact that an individual as to whom the officers have no reasonable and articulable factual wrongdoing happens to be in a public place where another person [suspected of wrongdoing] does not provide a basis for a *Terry*-type [detention when the detained] individual has no known connection [with the suspected wrongdoer] ) (citing *Ybarra v. Illinois*, 444 U.S. 83, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), *rehear. denied*, 444 U.S. 1049, 100 S.Ct. 741 (1980) (that probable cause nor a reasonable suspicion that criminal activity is afoot is created by "a person's mere proximity to others independently suspected of criminal activity").

As stated above, there was no reasonable suspicion to believe that defendant was up to any criminal activity. The video clearly demonstrates that both officers were together in the car prior to when they say they were but they fabricated reasons to persuade this Court into believing that there could have been a reason to suspect that the defendant could have been the suspect or that the defendant could have been up criminal activity by claiming that Hansen was by himself when he saw the defendant, and therefore not able to identify if the defendant and the suspect were one and the same person.

The officers also lightly touched on the fact that maybe the defendant could have led them to the suspect; although they testified that there was no known connection between the suspect and the defendant.  This does not make any kind of sense. Are the officers suggesting that every person coming out of a building located near a suspect's residence should be followed because they may lead police to their suspect?

<u>Disputed Fact : Barreras Was Not Wearing A Seatbelt</u>

Another major fact in dispute is that both Kadan and Hansen each claim that Barreras was not wearing his seatbelt. Defendant Barreras testified that he was wearing his seatbelt. Here, the video is of no assistance.

Testimony revealed that no seatbelt summons was issued. Additionally, testimony revealed that none of the police reports mentioned anything about a seatbelt, no less that barreras wasn't wearing one. Each officer's testimony is in conflict with the other's regarding how and when they noticed that the defendant was not wearing a seatbelt. In fact, the government was forced to highlight these inconsistencies and falsehoods on their direct case by bringing out the officers own conflicting versions on this seatbelt subject. Inconsistencies arise when non-truths are told. Defendant contends there was no seatbelt violation.

Hansen testified that as he "pulled up alongside the [Toyota] … explain[ed] to [Kadan] … I want you to look at the driver … and tell me if this is the guy you're looking

19

for … I pulled up to the Toyota … leaned back so Kadan could look across my chest at the driver … from the moment I pulled up to the Toyota [it] started moving … it was literally like a fraction of a second that we were there … I remember [Kadan] said to me … he's not wearing a seatbelt … as [Kadan] was saying that. I had my hand out my driver's window trying to stop the car that was behind [the defendant] to le me in behind the Toyota s o I could affect a traffic stoop on [the Toyota]." (T-94).

Hansen also thought it was odd because "[the defendant] didn't look at us … to see this car that was right next to him." (T-94-95).  Hansen goes on to say "as soon as I got behind [the Toyota], activated [the] emergency light, grabbed the PA system speaker [system]  and instructed the [defendant] to make the left on [to] Central Ave and pull the Toyota over." (T-95).[9]

Kadan testifies that "[they] pulled past the front end of the [Toyota], Hansen was driving, I was the passenger, I leaned over forward and I looked over at the [defendant] driving the Toyota." (T-19).  Furthermore, that Kadan "did not remember having any conversation with [Hansen] about the seatbelt. (T-20-21).  Kadan further testifies that when the officers "pulled up to the light [on Tuckahoe Road and Central Avenue] there [were] two cars in the left [turn] lane and [the officers] were in the" middle lane (T-57) and "there was a vehicle behind the [Toyota] in the left turn lane."[10] (T-58)

---

[9] Confirms the defendant's version that the officers did get behind the Toyota and it was before the Toyota made the left turn.

[10] Which means that the Toyota was the first car at the light as the defendant testified too and Hansen also testified that the Toyota was at the light on Tuckahoe Road "and there was another behind it, at least one [and] I don't know if there was other ones behind it." (T-94).  Although at some time later Hansen indicates that there were several cars behind the Toyota at the light.

Kadan continues testifying that they made a wide left turn by stating "as the vehicles in the left turn lane … were turning, we made our left turn from the straight [middle] lane, we didn't have to [get in front of anyone]" (T-59) and "we did get behind the [Toyota] as it turned, but not at the light, definitely no." (T-59).[11]

If as Kadan claims, that they "pulled past the front of the Toyota" then he would not have had to "lean forward" to look at the defendant.  Kadan was the front passenger in a car driven by Hansen and therefore Kadan would have had to look out the rear window of their car or at the very least the rear driver's side passenger window of their car, which means Kadan would have had to have looked somewhere behind Hansen and would not have had any reason to lean forward to see the defendant.

Also, if it occurred as Hansen described, that they had "pulled up alongside" the Toyota then it would be impossible to even ascertain if the defendant was even wearing a seatbelt because the seatbelt goes from left shoulder to right hip.  The officers would not have been able to see any alleged seatbelt violation if the light turned green and the Toyota started moving[12] and they were only next to the Toyota for" literally a fraction of a second."

---

[11] Although as explained above where Hansen had used the PA system to instruct the defendant the make the turn.

[12] Kadan testifies that  when "[they pulled up to the light, there were two cars in the left turn lane" (T-57) and that "there was definitely a vehicle behind the [Toyota] (T-56)  That would mean that the defendant was the fist car as the defendant also testified that "[the defendant] was the first car at the light and there was another car behind me" (T-136).

Without the alleged seatbelt violation, there exists no probable cause or reasonable suspicion of criminal activity to justify the stop of the Toyota. Therefore, the reason for the actual stop is significant in this case and although the DEA does not issue summons for traffic violations, they could have had one of the local units that arrived at the scene shortly after the arrest or at the very least Kadan could have included the alleged seatbelt violation in his report.[13]

The defendant testified that once the traffic light turned green he started moving forward and heard a car honk their horn from somewhere behind him an that he noticed in the rear view mirror that the unmarked car cut in front of the car behind him, activated their lights and that the defendant complied with the order given over the PA system[14] and pulled over. (T-136-137).

Defendant's testimony is confirmed by Hansen's testimony that when the light turned green Hansen got in front of the car that was behind the Toyota by sticking his hand out the window and signaling with his hand to allow him to get in and also that in the intersection before making the actual turn he activated his lights and gave the defendant directions over the PA System.

_____

[13] At the Suppression Hearing, Kadan admits that there was no mention at all in any of the reports with regards to the alleged seatbelt violation (T-45) nor was there any attempt made to give the defendant a traffic ticket by the local police that arrived on the scene shortly after the defendant was arrested. (T-54-56).

[14] As Hansen testified the order given over the PA System was for defendant to make the left on to Central Ave and pull the Toyota over. (T-95).

With a car behind the Toyota in the left turning lane and the officers in the middle lane, which is not a turning lane, making a wide left turn as Kadan claims that they made then they could not be behind the Toyota until after the actual turn had been completed and the defendant would not had been able to have been pulled over right at the corner next to the Dunkin Donuts and it would have been a little further down the block , like at the parking lot[15] or even the post office which was further down than the parking lot.

In *United States v. Robles*, 253 F.Supp.2d 544 (S.D.N.Y. 2002) the court ruled that the defendant "did not commit a traffic infraction" because "the government offered no evidence of a traffic violation recorded in the officer's contemporaneous memo book and no evidence of a traffic ticket issued" and the way the traffic infraction occurred did not make common sense and therefore did not find the officers testimony credible).

<u>The Stop of The Toyota</u>

Kadan testified that when they walked up to the Toyota, he was on the passenger side and Hansen was on the driver's side, and neither one of them had theirs weapons drawn, (T-23) as the defendant never made any furtive movements (T-36) and was very polite throughout the encounter. (T-25). Kadan testified that Hansen "identified himself and told the [defendant] that the [officers] were doing an investigation, asked where the [defendant] was coming from, asked whose vehicle it was, and also asked for a driver's license. I heard [the defendant] tell Hansen that it was [] Julio Rodriguez's vehicle … [the

---

[15] It was right at the corner because as Hansen testifies that "approximately 30, 40 feet past where [the Toyota] stopped there was the entrance to the parking lot." (T-96)

defendant] then produced the driver's license" (T-24) and that "Hansen never mentioned anything about not wearing a seatbelt" to the defendant." (T-54).

Kadan continues, that when he "opened the passenger side door, [Kadan] heard [the defendant] asked Hansen if [the defendant] could go into the glove box and look for the registration,"[16] but that the defendant was not able to produce it and that was when he observed Hansen "point at the bag [located "behind the front passenger seat on the floorboard"] and said, what's in the bag over there." (T-25).

Kadan further testifies after the defendant replied sneakers[17] that Hansen asked if he could look in the Timberland bag and that the defendant said "yeah you can look in the bag." (T-26)  That Hansen walked over to the passenger side where Kadan had been standing "opened the rear door and at that time [was] when I asked the defendant … to turn off the [Toyota}." (T-26)  That Hansen picked up the bag and said "Hey this is heavy for sneakers … can I look in the bag?" and that the defendant replied "yeah, go ahead … It's not my bag." (T-27)

 Kadan also admits that prior to asking for consent that they did not attempt to verify if the defendant's license was valid (T-49-50). There was no vehicle check performed. Defendant was known not to be the wanted subject. Moreover, no questions

---

[16] It should be noted that in Kadan's testimony he never indicates that Hansen asked for the Toyota's registration.

[17] The defendant never said anything about sneakers; however, even assuming arguendo that the defendant did say sneakers that would not have created any probable cause or reasonable suspicion that criminal activity is afoot or any reason to believe defendant was not telling the truth.

were asked of defendant about the wanted subject. Without any basis, consent to search the bag was purportedly asked for and given. After the bag was searched and cocaine was found, the defendant was arrested without incident and read his *Miranda* rights. (T-27).

With respect to Hansen, he testified that when the defendant pulled over he informed the defendant that "[the officer's] were with the DEA conducting an investigation in the neighborhood, asked where the defendant was coming from "to which the defendant pointed up towards the area of 808 Tuckahoe Road" then "I asked for [the defendant's] license and registration … he produced … [the] license … I took the license and I asked [the defendant] for the registration" to which the defendant  "asked if he could look in the glove box for the registration" (T96-97) and that after looking in the glove box that defendant indicated that "he didn't have the registration." (T-97).

Hansen testified that he informed the defendant that "[w]e're DEA agents … we're not here to write you tickets or break your chops." (T-98) and therefore was not trying to arrest the defendant for any VTL violation.  Therefore, despite the officers statutory right to arrest, "no valid search of vehicle incident-to-arrest where defendant not first arrested but only detained."[18] *Diehl v. Munro*, 170 F.Supp.2d, at 319 (N.D.N.Y.2001) (quoting *McCardle v. Haddad*, 131 F.3d 43, 49-50 (2nd Cir.1997).

---

[18] CPL §140.10 in conjunction with N.Y. VTL §155 indicates an officer "may arrest" the driver of a vehicle if the officer observes the driver commit a traffic infraction.  See, *United States v. Scopo*, 19 F.3d 777 (2nd Cir.), *cert. denied*, 513 U.S.877, 115 S.Ct.207, 130 L.Ed.2d 136 (1994); see also, *Atwater v. City of Largo Vista*, 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001); however, under "N.Y. VTL §225 (1) and §226 (2)" "the police also have the discretion of issuing a summons for a traffic infraction".  *United States v. McFadden*, 238 F.3d 198 (2nd Cir.), *cert. denied*, 534 U.S. 898, 122 S.Ct. 223, 151 L.Ed.2d 159 (2001), and that issuing a summons for a vehicle infraction is the far more common practice than arrest. *Knowles v. Iowa*, 525 U.S.113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998). In *Scopo, supra* and *Atwater, supra* the

Hansen continues his testimony and says that he asked the defendant where he was going and that the defendant replied "2816 Parkview Terrace in the Bronx." (T-97). Hansen also states he asked if the car belonged to the defendant to which the defendant replied "no … it's Julio Rodriguez's car" and then that Hansen asked if Julio had given the defendant permission to use the car to which the defendant replied yes. (T-97).

Hansen also testified that he then asked the defendant if the defendant could "get in touch with Julio for [the officers] to ask if [the defendant] is allowed to have Julio's [Toyota]" and continued by telling the defendant "I need to know or confirm that you're allowed to have this vehicle and it's valid before you drive away."[19] (T-98)

The defendant testified that Hansen approached on the driver's side and "asked for [the defendant's] license … as [the defendant] was giving [Hansen] the license [Hansen] asked … if [the defendant] owned the car ... [the defendant] replied no … Hansen asked who owned it [a]nd [the defendant] told [Hansen] Julio Rodriguez … [the defendant] asked if [the defendant] could get the registration out of [the] glove compartment and Hansen said yes … [the defendant] reached over to the glove compartment and got … a stack of papers…[20] [21] and [the defendant] looked through

---

defendants were immediately ordered out of their cars without even asking for paperwork as they were arrested for the traffic infraction.

[19] During Kadan's testimony he never mentions anything about Hansen asking the defendant about calling the owner of the Toyota nor about telling the defendant that the defendant can not drive away until the information is verified.

[20] The defendant was shown copies of the items that were removed from the Toyota and out of all the papers inventoried the defendant only indicated 5 items that he recognized from having been removed from the glove compartment. (T-143).

them [] found the registration [the defendant] went to hand it to [Hansen] and [Hansen] wasn't standing by the [driver's side] door [any] more … but then [the defendant] heard a voice coming from the back [passenger side window] … [and it was Hansen] talking to me through the back window and [Hansen] was saying 'what's that' and Hansen was pointing to the bag … [the defendant] told [Hansen] 'that's my bag' … [Kadan] told [the defendant] to shut the [Toyota] off … [the defendant] shut the [Toyota] off … Hansen opened the door and had already grabbed the bag[22] …but had trouble pulling out the inner bag that was inside the bag [because] it was in there pretty tight.[23] (T138-139).

This Court must initially determine whether or not the stop of the vehicle was justified at it inception.  *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 2574 (1975).  An investigative stop is violative of the Fourth Amendment, when there are no specific, articulable facts to support the conclusion that the individual stopped was engaged in criminal activity.  *United States v. Nargi*, 732 F. 2d 1102, 1105 (2d Cir. 1984).

Here, the officers conducting the stop had seen no criminal or suspicious conduct and were in possession of no information which in any way suggested that the vehicle was being used in the violation of the law.

---

[21] Hansen does admit that defendant had "papers in the front seat with him" which were not [in the defendant's lap]" when Hansen first initiated the traffic stop. (T-122).

[22] As Kadan confirms, he told defendant to shut off the Toyota at the same time that Hansen opened the rear passenger door and grabbed the bag.   (T-26).

[23] It can be seen that the inner bag was tight inside the Timberland bag from viewing the video footage at 22:49:25 and from 22:49:28 - 22:49:30.

The stop here cannot be justified, based upon the type of behavior exhibited by the defendant, as sufficient, in the mind of a trained law enforcement officer, to warrant an investigative stop. *United States v. Alexander*, 907 F. 2d 269, 272 (2d Cir. 1990). Rather, these facts fall within the class of cases which are deemed insufficient to support the interference, because premised upon the sheerest speculation, suspicion or hunch. *United States v. Sokolow*, 490 U.S. 1,7, 109 S.Ct. 1581 (1989). There was absolutely no indication of any illicit activity on the part of the individual who was stopped. *United States v. Ramirez-Cifuentes*, 682 F. 2d 337, (2d Cir. 1982).

Since there were no specific, objective and articulable facts which gave rise to a reasonable belief that the occupant of this vehicle had engaged, was then engaged or was about to engage in criminal activity, all evidence seized thereafter must be suppressed. *United States v. Cortez*, 449 U.S. 441, 417, 101 S. Ct. 690 (1981); *United States v. Harley*, 682 F. 2d 398, 400-01 (2d Cir. 1982).

<u>Consent / Prolonged Detention</u>

It is the defendant's contention that the officers unnecessarily prolonged the detention in order to obtain consent to search. After requesting defendant's license, no questions were asked relating to the alleged seatbelt violation. Hansen purportedly asked for the registration as well, however, as defendant was trying to locate it, Hansen walked away from the driver such that he was no longer there when defendant found the registration in a very short and reasonable amount of time and went to hand it to Hansen. Hansen at that point prolonged the detention by moving to the passenger side rear door to

inquire about the Timberland bag on the floor behind the passenger seat and thereby circumvented the protections guaranteed to every citizen by the Fourth Amendment.

Both officers gave the same testimony with regards to the registration stating  that "he could not find the registration."  However, their own testimony demonstrates that they were not being truthful on this subject. Hansen testified that the registration was in the sunglass compartment near the visor of the Toyota in a red plastic folder. Kadan testified that the car papers were found in an envelope in the trunk of the Toyota.

However, on cross examination, as detailed in the following excerpt, Kadan admits in one quick sentence (T-49-50) that the defendant did "come up with" the registration for the Toyota.

> FISHER: Upon Hector Barreras giving over the license, did you or any other officer run it to see if it was valid or if he had warrants at that time prior to the arrest for consent?

> KADAN: Did we run his license before we engaged him in a conversation about searching the vehicle?

> FISHER: Prior to asking for consent, did you run the license?

> KADAN: From what I observed and from what I know, we did not run the driver's license on the street.  It may have been run subsequently by one of the police officers.

> FISHER: I'm just asking prior to the consent, what you said was consent.

> KADAN: Not before that.

> FISHER: The documents that you discover and that you know were in there that night was a valid New York State registration in the name of Julio Rodriquez, right?

KADAN: I believe that was documents in the trunk or somewhere in the vehicle where *he did come up with a registration in Julio Rodriguez's name, that is correct.*

In contrast, Kadan goes on to testify "I know for certain that [the defendant] never produced a registration to {Kadan} or to Hansen ever. In other words, he never handed it to us or showed us any document that showed who owned the vehicle or who the vehicle was registered to. That's for certain." (T-51).

With respect to the Timberland bag, the officers did not claim that their attention was diverted to the bag on the floor for any safety reasons by indicating that they were fearful about the bag located on the floor behind the front passenger seat. They possessed no narcotics information with respect to defendant, the car or the bag. Defendant had already handed over his license, had already said who the owner of the Toyota and the neither of the officers attempted to conduct any record checks on the above.

The Supreme Court has made it clear that a traffic stop "constitute[s] a 'seizure'" within the meaning of the Fourth Amendment; however brief the detention may be. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). These seizures do not offend the Constitution, however, so long as they are reasonable. *Bringham City v. Stuart*, 547 U.S. __, __, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006). The reasonableness of these stops are judged by the principles developed for investigative detentions in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct.1868, 20 L.Ed.2d 889 (1968). In brief, to be reasonable, the law enforcement action must have been "justified at its inception" "and

reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S., at 20.

"The *Berkermer* Court cautioned that by analogizing a traffic stop to a *Terry* stop it did not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop."  *Illinois v. Caballes*, 543 U.S. 405, 420, 125 S.Ct. 834, 160 L.Ed2d 842 (2005) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); and has recently reiterated in a vehicle stop case that "[i]t is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Caballes*, 543 U.S., at 407 (citing *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *See also Muehler v. Mena*, 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) (a lawful seizure "can become unlawful if it is prolonged beyond the time reasonably required to complete that initial mission") (citing *Caballes*, 543 U.S., at 407).

The Supreme Court has ruled that when a "search [is] subject to the Fourth Amendment" scrutiny … "the shift in purpose" "from a lawful traffic stop into a drug investigation" must be "supported by a reasonable suspicion." *Muehler*, 544 U.S., at 101 (citing *Caballes*, 543 U.S., at 408); as "the government may not take advantage of a [driver's] immobility to search for evidence unrelated to the reason for the detention." *Caballes*, 543 U.S., at 420; and although "mere police questioning does not constitute a seizure," *Muehler*, 544 U.S., at 101 (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111

S.Ct. 2382, 115 L.Ed.2d 389 (1991)).  However, when the "questioning extend[s] the time [that defendant is] detained … additional Fourth Amendment justification for inquiring about [the bag] was required." *Muehler*, 544 U.S., at 101.

"Both the stop and inquiry must be 'reasonably related in scope to the justification for the initiation'" *United States v. Tehrani*, 49 F.3d 54, 61 (2nd Cir.1995) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); and the inquiry must be "minimally intrusive of the 'individuals Fourth Amendment interests'" *United States v. Glover*, 957 F.2d 1004, 1011 (2nd Cir.1992) (citing *United States v. Sharpe*, 470 U.S. 675, 685-86, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

When "considering the reasonableness of the duration of a particular detention, a court must 'examine whether the police diligently pursues a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Glover*, 957 F.2d, at 1011 (citing *Sharpe*, 470 U.S., at 686.  "The question is not simply whether some … alternative [method] was available, but whether the police acted unreasonably in failing to recognize it." *Glover*, 957 F.2d, at 1011 (citing *Sharpe*, 470 U.S., at 687).

In the present case, the officers did not have any reasonable suspicion that the defendant was engaged or about to be engaged in any criminal activity and therefore it was not objectionably reasonable to prolong the stop for the alleged traffic violation in any of the ways that were described in detail above. Namely, 1) by first asking about the

suspect they were looking for, instead of first asking defendant for his identification, as questions about the suspect were not reasonably related in scope to the alleged seatbelt violation; 2) by walking away without waiting for a reasonable amount of time, which was only a matter of seconds, for the Toyota's papers; and 3) that after having been given the name of the owner, the officers made no attempt to conduct a computer check to verify the defendant's driver's license or to find out if the Toyota did in fact belong to Julio Rodriguez before Hansen began to inquire about the Timberland bag.

The officers had no probable cause nor a reasonable suspicion to believe that the Timberland bag contained anything illegal. Over zealous officers must not be permitted to go on a fishing expedition[24] in an attempt to find evidence of an unrelated crime where there is no probable cause or at least a reasonable suspicion that criminal activity is afoot. Nor can an officer shift the purpose from a lawful traffic stop into a drug investigation unless supported be a reasonable suspicion because the government may not take advantage of a driver's immobility to search for evidence unrelated to the reason for the detention.

The officer was not going to find anything with regards to the alleged seatbelt violation in the Timberland bag. Neither one of the officers commenced a computer check in order to attempt to verify any information provided by the defendant nor was Hansen going to find out who the owner of the Toyota was by inquiring about or by looking in the Timberland bag. *See Knowles v. Iowa*, 525 U.S.113, 118, 119 S.Ct. 484,

---

[24] As Kadan admitted that at no time before the drugs were found in the Toyota did the officers have any "probable cause" or reasonable suspicion to believe that the Toyota contained contraband. (T81-82).

142 L.Ed.2d 492 (1998) (the "[defendant] was stopped for speeding … [and] no further evidence was going to be found either on the person of the offender or in the passenger compartment of the car").

Defendant contents that neither of the "[officers] pursued a means of investigation that was likely to confirm or dispel their suspicion quickly" but also that "the [officers] acted unreasonably in failing to recognize or pursue it" because the officers should have conducted a computer check on the defendant and the information that was provided regarding the ownership of the Toyota.  The only way that the officers were going to confirm or dispel any information on the defendant was by conducting a computer check and not by attempting to find out what was in the Timberland bag.  See *United States v. Tehrani*, 49 F.3d, at 61 (2nd Cir.1994) (after defendant's detention, the officers were diligent in verifying the verbal information provided by the defendant and they did so by contacting the proper governmental agency that had access to verify such information); see also *United States v. Martinez*, 983 F.2d 968, 976 (10th Cir.), cert. denied, 508 U.S. 922, 113 S.Ct. 2372, 124 L.Ed.2d 277 (1993) ("Though the encounter lasts longer than a routine traffic stop, we believe it did not exceed permissible bounds" as "[the defendant] could not identify the rightful owner by name, and provided no registration " "and a computer check [was] inconclusive as to the true owner of the vehicle" and therefore the officers "suspected the car was stolen") (citing *United States v. Wong Ching Hing*, 867 F.2d 754 (2nd Cir.1989) (the traffic stop lasted longer than usual but "the extra time" "was due to the fact that the driver of the car had no registration and gave what were, to say the least, suspicious answers as to the ownership of the car"); *United States v. Campos*, 237

Fed. Appx. 949, 954 (5th Cir.2007) (other factors along with the "inability … to identify the name of the owner of the van all created suspicion").

However, as previously described that "mere police questioning" does not violate the Fourth Amendment and the officers can ask whatever they like as long as the questions do not extend the length of the detention.  *Muehler*, 544 U.S., at 101 (The content of police questions during a lawful detention does not implicate the Fourth Amendment as long as those questions do not prolong the detention)

"The correct Fourth Amendment inquiry (assuming the detention is legitimate) is whether an officer's traffic stop questions 'extended the time' that a driver was detained, regardless of the questions' content." *United States v. Stewart*, 473 F.3d 1256, 1269 (10th Cir.2007) (citing *Muehler*, 544 U.S., at 101) (also citing *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir.2006) ("In light of *Muehler*, we have held that '[a]s long the [deputy's] questioning did not extend the length of the detention, … there is no Fourth Amendment issue with respect to the content of the questions'"); *see also United States v. Walker*, 933 F.2d 812 (10th Cir.), *rehear. den*., 941 F.2d 1086, *cert. denied*, 502 U.S. 1093 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) ("our determination that the defendant was unlawfully detained might be different if the questioning by the officer did not delay the stop beyond the measure necessary to issue a citation.  For example this case would be changed significantly if the officer asked the same questions while awaiting the results of the NCIC [National Crime Information Center] license inquiry").

A traffic stop is not prolonged if an officer asks questions while at the same time actions are being performed that are "reasonably related in scope to the justification for the initiation" because then the traffic stop is not being "prolonged beyond the time reasonably required to complete that initial mission"  *See United States v. Rodriguez-Flores*, 249 Fed. Appx. 317, 320 (5th Cir.2007) ("while [police] await the result of the computer check, the police may question …, even about subjects unrelated to the reason for the stop … detention, not questioning, is the evil at which *Terry's* second prong is aimed") (citing *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir.1993); *United States v. Soriano-Jarquin*, 492 F.3d 495, 501 (4th Cir.2007) ("[Questioning] did not prolong the stop, as it occurred while the police trainee checked the driver's license and registration and prepared his citation") (citing *Caballes*, 543 U.S., at 407, 125 S.Ct. 834, 160 L.Ed2d 842 (2005) (police questioning that does not prolong a seizure does not provide a legitimate basis for a Fourth Amendment claim); *United States v. Crain*, 33 F.3d 480, 485 (5th Cir.), *cert. denied*, 115 S.Ct. 1142 (1995) (when questioning takes place while officers are waiting for the results of a computer check … and therefore does not extend the duration of the stop … the questioning does not violate *Terry*); *see also Caballes*, 543 U.S., at 406 ("while [the officer] was in the process of writing a warning ticket, [another officer] walked his dog around [the defendant's] car" and therefore the traffic stop was not prolonged).

The Supreme Court has made it clear that it does not matter if a detention has been prolonged by only a second, it nonetheless has been prolonged. See *Caballes*, 543 U.S., at 407, 125 S.Ct. 834, 160 L.Ed2d 842 (2005) where in its decision the Court also

cited an Illinois Supreme Court case (*People v. Cox*, 202 Ill.2d 462, 782 N.E.2d 275 (Sup. Ct. Ill.2002).

The Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) stated that in determining the overall reasonableness of a stop the Court must employ a two part test: first, "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S., at 10-20.

Once again, all of the Justices, the majority and the dissenting,[25] were unanimous in reiterating the above paragraph, and again after 40 years ruled that "a seizure … can become unlawful if it is prolonged beyond the time reasonably required to complete the initial mission". *Caballes*, 543 U.S., at 420.

As the Supreme Court ultimately decided it does not matter if it is questions[26] or actions[27] on part of the officer that has prolonged the stop, even for a few seconds, it nonetheless unnecessarily prolongs the stop.

_____

[25] The *Caballes* Court was presented with a question, "[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." *id*. 543 U.S. at 407
  In a divided Court the two dissenting Justices answered it in the negative because "the police impermissibly broadened the scope of the traffic stop in this case into a drug investigation." *id*. at 419.
  The majority of Justices did consider the dissents argument but reasoned that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not subject to the Fourth Amendment," id. at 408 (quoting *United States v. Jacobsen*, 466 U.S. 109, 123, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)), and that "a dog sniff [did] not change the character of a traffic stop that [was] lawful at its inception and otherwise executed in a reasonable manner, … [as it did not] infringe[] on [his] constitutionally protected interest in privacy." id. at 408.

It is well established that searches conducted without a warrant are per se unreasonable, subject to a few well-recognized exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041 (1973). Evidence discovered as a result of an illegal warrantless search is considered "fruit of the poisonous tree" and must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). One of the exceptions to the general rule is an automobile search, which may be sustained if based upon probable cause to believe that the vehicle contains contraband or evidence of a crime. *United States v. Harwood*, 998 F.2d 91, 96 (2nd Cir.), *cert. denied*, 510 US 971, 114 S.Ct. 456, 126 L.Ed.2d 388 (1993); *California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 1986, 114 L.Ed.2d 619 (1991); *Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408 (1999); *see also California v. Carney*, 471 U.S. 386, 394, 105 S.Ct. 2066, 2071, 85 L.Ed2d 406 (1985). However, where the Government claims that the contested search falls within such an exception, it has the burden of demonstrating that fact. *United States v. Kon Yu-Leung*, 910 F.2d 33, 41, (2d.cir. 1980).

Here, the authorities had no information and no reason to believe that the defendant's vehicle contained contraband. The car was stopped for the sole purpose of trying to develop such information. Nothing that happened after the stop justified the search.

If the Government seeks to rely upon the statements of the defendant to justify their search, that effort would be unavailing because the statements were the product of a

___

[26] *Muelher v. Mena*, 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005)

[27] *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed2d 842 (2005)

violation of the defendants' Fourth and Fifth Amendment rights. The information in the possession of law enforcement didn't even come close to establishing probable cause to believe that the vehicle contained contraband.

Alternatively, the government will claim that the defendant consented to a search of the vehicle and its contents. When the validity of an alleged consensual search is at issue as is the case here, the Government has the burden of establishing that the consent was freely and voluntarily given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041 (1973). The test is whether the consent is the product of a free and unconstrained choice by its maker. *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988). The burden to demonstrate consent must be established by a preponderance of the evidence (*Lego v. Toomey*, 404 U.S. 477, 92 S.Ct. 619[1972]: *United States v. Calvente*, 722 F. 2d 1019, 1023 [2d cir. 1983]), and is not satisfied by a showing of submission to authority. *Florida v. Royer, supra.*

Here, after the agents detained the defendant, the agents claim that he orally consented to a search of a bag contained inside the vehicle. Defendant adamantly maintains that he did not at any time give the police consent or permission to search the vehicle or any contents therein. *Schneckloth v. Bustamonte,* supra; *United States v. Arango-Correa,* supra. Consequently, all evidence seized from the vehicle must be suppressed.

In determining whether or not a consent was voluntarily made or was instead the product of coercion, either express or implied, the Court is obligated to conduct a "fact-based examination" of the record. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034 (1987). The Court should review the "whole picture" (<u>*United States v. Sokolow*</u>, 490 U.S. 8, 109 S.Ct. 1581 [1989]), and base its determination upon the particular circumstances of the case under consideration. *United States v. Leung*, 910 F. 2d 33, 40-41 (2d cir. 1990).

It should be pointed out however, that a Fourth Amendment violation invalidates consent. *See e.g.*, *United States v. Awadallah*, 202 F.Supp.2d 82 (S.D.N.Y.), *rev'd. on other grounds*, 439 F.3d 42 (2003) (consent tainted because no break in the consensual chain between the illegal detention and consent) (citing *United States v. Ceballos*, 812 F.2d 42, 50 (2nd Cir.1987); *Florida v. Royer*, 460 U.S., at 507-08, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (ruling that consent was tainted as the bounds of the investigative stop had been exceeded); *United States v. Restrepo*, 890 F.Supp. 180, 196 (E.D.N.Y.1995) ("illegal investigative stop invalidates consent unless the government bears its burden of showing that the taint of the illegal stop had dissipated before the consent was given") (quoting *United States v. Mire*, 851 F.Supp. 96, 105 (W.D.N.Y.1994) (citing *United States v. Montilla*, 928 F.2d 583, 590 n.3 (2nd Cir.1991)), *rev'd on other grounds*,  51 F.3d 349 (2nd Cir.1995).

Furthermore, consent is invalid when it is given during a period of prolonged detention. A prolonged detention occurs when the rules for the investigative detention

are exceeded.  *See Royer*, 460 U.S., at 500 ("[A]n investigative detention must be

temporary and last no longer than is necessary to effectuate the purpose of the stop [and]

the investigative methods should be the least intrusive means reasonably available to

verify or dispel the officers suspicion ....").[28]


Furthermore, nervousness does not constitute probable cause or reasonable

suspicion that criminality is afoot.  Nervousness can be cause by the anxiety of the traffic

stop as "[t]he Supreme Court has noted that a traffic stop is an 'unsettling show of

authority' that may create substantial anxiety." *United States v. Miller*, 821 F.2d 546 (11th

Cir.1987) (quoting *Delaware v. Prouse*, 440 U.S., at 657, 99 S.Ct. 1391, 1398, 59

L.Ed.2d 660 (1979).

<u>Miranda</u>

The officers testified that after they found the contraband, they went over to the

driver's side, took the defendant out of the Toyota, and placed the defendant under arrest.

Although the officers claimed to have read defendant the *Miranda* rights, the defendant

testified that no *Miranda* rights were read at the scene of the stop (T-145).  The defendant

indicates that he made no statements with the officers after the cocaine was found in the

Toyota.

---

[28] A seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution infringes interests protected by the Constitution, *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); and the *Berkemer* Court has already cautioned that by analogizing a traffic stop to a *Terry* stop, it did "not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop." *Berkemer v. McCarty*, 468 U.S., at 439 n.29.

Although the officers claim that the defendant was answering the officers questions after the contraband was found, the defendant stated "I didn't speak to them no, I asked for an attorney, I asked for a phone call so I could call an attorney." (T-154)  The defendant also reiterated his position when Hispanic officer (Jose Piña) arrived on the scene after the arrest and unsuccessfully questioned the defendant in Spanish as the defendant replied "the reason [the defendant] is not talking to anybody is because I'm not speaking … I want a phone call to call my attorney (T-155) … to which the defendant did have an attorney's business card in his wallet.  (T-145)

Kadan was called back to the witness stand as rebuttal witness to rebut part of the defendant's testimony about what the defendant allegedly responded when asked certain questions after the defendant's arrest at the scene of the arrest and at the DEA headquarters.  However, Kadan made no attempt to rebut the defendant's testimony that he did request an attorney once he was arrested.

Pursuant to *Miranda*[29], the police must advise a defendant of his rights only if two preconditions are met: namely custody and interrogation. *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S.Ct. 547, 133 L.Ed.2d 383 (1995).

After an arrest and before a custodial interrogation a defendant must be informed of his right to remain silent and his right to the presence of an attorney prior to questioning, regardless of his ability to afford one.  *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).  If the defendant requests counsel, all

---

[29] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)

interrogation must cease until an attorney is present. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct.1880, 68 L.Ed.2d 378 (1981).

If it is argued by the government that the statements were voluntary for the purpose of the Fifth Amendment, the statements must still pass muster under the Fourth Amendment.

"In *Brown*[30] and *Dunaway*[31], this court firmly established that the fact that a confession [or statement] may be 'voluntary' for the purposes of the Fifth Amendment, in the sense of *Miranda* warnings …. [A] finding of 'voluntariness' for purposes of the Fifth Amendment is merely a threshold requirement for the Fourth Amendment analysis." *Taylor v. Alabama*, 457 U.S. 685, 690 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982).

Although, statements may survive the Fifth Amendment scrutiny, but were the direct result of an unlawful arrest, they must be excluded under the Fourth Amendment. *Dunaway*, 442 U.S., at 217; *Brown*, 422 U.S. at, 603-05; *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983)

"With respect to statements following an arrest, *Miranda* warnings by themselves are insufficient to attenuate the taint of an unconstitutional arrest," *United States v. Restrepo*, 890 F.Supp. 180, 198 (E.D.N.Y. 1995), as "[w]here a confession [or statement]

_____

[30] *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)

[31] *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)

follows an illegal search, 'it is even more apparent … that giving the *Miranda* warnings

will not break the casual chain, for the warnings do not advise [the defendant] whether

the evidence he is confronted with is unlawfully obtained or whether it will be admissible

at trial.' " *Restrepo*, 890 F.Supp., at 198 (citing 1 Waye R. LaFave & Jerold H. Israel,

*Criminal Procedure* § 9.4, at 747 (1984)).


There are several factors to consider in determining if statements have been

purged of the taint of a Fourth Amendment violation.  These factors are as follows: (1)

the temporal proximity of the arrest and the statements or confessions, (2) the presence of

intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.

*Taylor v. Alabama*, 457 U.S., at 690; *Brown*, 422 U.S., at 603-04; *Dunaway*, 442 U.S., at

218.


The Supreme Court has had the opportunity on various occasions to decide if a

break in time between illegal arrests and post-*Miranda* statements has purged the taint of

a Fourth Amendment violation.  *See e.g*., *New York v. Harris*, 495 U.S. 14, 24, 110 S.Ct.

1640, 109 L.Ed.2d 13 (1990) (one hour delay does not purge the taint); *Brown v. Illinois*,

422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (ruling inadmissible defendants

statement which followed his illegal arrest by two hours).


The Supreme Court in *Taylor v. Alabama*, 457 U.S. 685, 102 S.Ct. 2664, 2667, 73

L.Ed.2d 314 (1982) has also ruled that the illegality of an arrest was not cured by the fact

that six hours had elapsed between the time of arrest and confession when the defendant

was in custody during that time period.  The Court held that not even *Miranda* warnings,

coupled with the fact that defendant was permitted a short visit with his girlfriend, were

able to cure an antecedent Forth Amendment violation.

Under the fruit of the poisonous tree doctrine, evidence acquired directly or

indirectly as a result of an illegal search or seizure will be excluded. *Wong Sun v. United*

*States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "[w]hether the unlawful police

behavior bore a casual relationship to the acquisition of the challenged [evidence]" is a

primary question. *United States v. Crews*, 445 U.S. 461, 463, 100 S.Ct. 1244, 63 L.Ed.2d

537 (1980). The purpose is to deter police misconduct and safeguard the integrity of the

judicial process. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441

(1963); *United States v. Alvarez-Porras*, 643 F.2d 54, 59 (2nd Cir.1981), cert. denied, 454

U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981).

Furthermore, the court in *United States v. Mesa*, 62 F.3d 159, 163 (6th Cir.1995),

went even further and stated:

> "This case is simply on in which the officer crossed over the line …
> [a]lthough there is always a temptation in cases of this nature when a
> substantial quantity of drugs and firearms are found to let the end justify the
> means, *it must be remembered that the courts only see cases in which the*
> *conduct of the officer resulted in contraband being found.  If the officers had*
> *found no drugs in the defendant's car, obviously we would not even know*
> *that this traffic stop had ever occurred.*  Therefore, we must accept that
> courts will be 'thwarting' what some may view as a good piece of police
> work when a motion to suppress is granted in cases of this nature.
> Notwithstanding the importance of drug interdiction, however, we are still
> charged with the responsibility of seeing that the interdiction occurs without
> the Constitution being violated.  Such was not the case here." id., 62 F.3d at
> 163.

The same court also noted that "it is not clear that this decision really has "thwarted" good police work.  In the first place, officers who exceeded their authority are not doing good police work." id., 62 F.3d at 163 n.4

<u>CONCLUSION</u>

It is respectfully submitted that the evidence found in the Toyota and the alleged statements by the defendant, which the defendant does not concede making, be suppressed as "fruits of the poisonous tree" due to the violation of the defendant's 4th and 14th Amendments.