UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA,        :
                                 :
            - v. -               :        **07 Cr. 822 (SCR)**
                                 :
HECTOR BARRERAS,                 :
                                 :
            Defendant.           :
                                 :
                                 :
- - - - - - - - - - - - - - - - x


**THE GOVERNMENT'S POST-HEARING SUBMISSION IN OPPOSITION TO THE
DEFENDANT'S PRETRIAL MOTION**


                        MICHAEL J. GARCIA
                        United States Attorney for the
                        Southern District of New York
                        One St. Andrew's Plaza
                        New York, New York 10007


Nicholas L. McQuaid
Assistant United States Attorney
     -Of Counsel-

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . .    1

THE SUPPRESSION HEARING . . . . . . . . . . . . . . . . . .    2

    A.    THE GOVERNMENT'S CASE . . . . . . . . . . . . . . .    2

    B.    THE DEFENSE CASE . . . . . . . . . . . . . . . . .    7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . .   10

    I.    THE GOVERNMENT'S WITNESSES WERE CREDIBLE . . . . .   10

    II.   BARRERAS WAS NOT CREDIBLE . . . . . . . . . . . .   11

    III.  THE STOP OF THE WHITE AVALON WAS LAWFUL. . . . . .   13

        A.    The Stop Was Justified By Reasonable Suspicion of
            Criminal Activity . . . . . . . . . . . . . .   14

            1.    Applicable Law . . . . . . . . . . . . .   14

            2.    The Facts Justified the Agents' Reasonable
                Suspicion of Criminal Activity    . . . .   16

        B.    The Stop Was Justified by a Violation of New
            York's Vehicle and Traffic Laws . . . . . . .   18

    IV.   THE SEARCH OF THE ORANGE BAG WAS LAWFUL . . . . .   20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . .   24

### PRELIMINARY STATEMENT

Following an evidentiary hearing held on February 28, 2008, and pursuant to the Court's direction, the Government respectfully makes this post-hearing submission in opposition to the motion to suppress evidence ("Suppression Motion") of defendant Hector Barreras ("Barreras"). Barreras has moved to suppress evidence seized during a traffic stop conducted on July 23, 2007, and statements made to law enforcement following his arrest. As set forth below, the February 28 hearing made clear that the Suppression Motion lacks merit and should be denied.

First, the testimony offered by the Government's witnesses at the hearing was consistent and credible. The testimony offered by the defendant was not; it lacked detail and defied common sense in several respects, and should not be credited.

Second, evidence presented at the hearing established that the stop of the white Toyota Avalon driven by Hector Barreras ("White Avalon") was lawful. There was reason for Drug Enforcement Administration ("DEA") agents to suspect the White Avalon was involved in criminal activity: the car was sitting in a parking lot of an address that was at the center of an ongoing manhunt and its driver, Barreras, was acting suspiciously. Additionally, DEA agents had reason to suspect that Barreras had

committed a traffic violation: a DEA Agent saw that Barreras was not wearing a seatbelt moments before the car was stopped.

Third, evidence established that the search of the orange bag found in the White Avalon was lawful. Barreras freely gave DEA Agents consent to search the orange bag that contained the drugs that were seized.

## THE SUPPRESSION HEARING

On February 28, 2008, this Court held a hearing on the Suppression Motion. Two members of the Westchester DEA Taskforce involved in the stop of the White Avalon on July 23, 2007, and the subsequent search, testified on behalf of the Government: Special Agent Mark Kadan ("Special Agent Kadan") and Detective Dean Hansen of the Westchester Police Department ("Detective Hansen") (collectively "DEA Agents"). The defendant testified on his own behalf.

### A.    The Government's Case

On the afternoon of July 23, a suspect in a narcotics investigation was spotted by Special Agent Kadan near 808 Tuckahoe Road, the suspect's residence, while attempting to park his car. (Tr. 15:7-25).[1] When the agents approached, the suspect rammed Special Agent Kadan's vehicle and escaped, first in his

---

[1]  Tr. refers to the transcript of the hearing held on February 28, 2008.  Barreras Pretrial Mot. refers to the Suppression Motion filed on January 4, 2008.

2

car and then on foot. (Tr. 16:7-17). The DEA immediately began a manhunt with the help of local law enforcement. (Tr. 16:19-21).

Detective Hansen was called to assist in the search. (Tr. 83, 84:13-18). Detective Hansen, who was home at the time he was called, drove to the area around 808 Tuckahoe Road and sought to make contact with other law enforcement officers. (Tr. 84:3-85:10). Soon after he arrived, Detective Hansen noticed the White Avalon in the parking lot behind 808 Tuckahoe Road. (Tr. 86:7). He was reluctant to enter the parking lot because the car he was driving is frequently identified as an undercover police car. (Tr. 86:15-87:1).

When he did enter the lot, Detective Hansen observed that the White Avalon had its lights on, its motor running, and the driver's side window rolled down. (Tr. 88:1, 87:13). He also noticed a man, later identified as Barreras, (Tr. 24:7-10, Tr. 103:15-23), sitting in the driver's seat of the car staring at him intently, (Tr. 87:12-15).

Detective Hansen drove into the parking lot, but then turned his car around almost immediately after entering, and prepared to leave. (Tr. 87:17-23). While he was turning around, the White Avalon began to back out of its parking space. (Tr. 87:20-23, 88:3-4). The White Avalon was approximately five feet out of its parking space when Detective Hansen completed his

3

turn, but it stopped moving as soon as Detective Hansen started to drive back toward the entrance of the lot. (Tr. 88:6). As Detective Hansen passed behind the White Avalon and exited the lot, he observed Barreras staring at him over his left shoulder. (Tr. 88:6-11). Detective Hansen testified that he "couldn't understand why is this guy looking at me so hard." (Tr. 88:9-11).

Detective Hansen drove out of the lot and assumed a position where he could watch the White Avalon without being seen.[2] (Tr. 88:13-18). When he saw the White Avalon exit the lot moments later, Detective Hansen decided to follow the car and pull it over. (Tr. 89:11, Tr. 93:1). Before executing the stop, Detective Hansen picked up Special Agent Kadan, (Tr. 92:24-93:1), and explained to him why he wanted to stop the car, (Tr. 93:8-15). The DEA Agents pulled up next to the White Avalon, which was stopped at a traffic light, waiting to make a left hand turn.[3] (Tr. 93:25-94:11). Special Agent Kadan noticed Barreras was not wearing a seatbelt.[4] (Tr. 21:2). The DEA Agents then pulled in

---

[2] Detective Hansen's account of the events in the parking lot was corroborated at the hearing by the surveillance video taken at 808 Tuckahoe Road on July 23, 2007. (Tr. 89-92).

[3] When they pulled next to the White Avalon, Special Agent Kadan was able to confirm that the driver was not same person who had rammed his car earlier that day. (Tr. 94:16-18).

[4] Detective Hansen also noticed that the driver of the White Avalon was not wearing a seatbelt but could not be certain when it was that he became aware of it. (Tr. 101:8). As Detective

4

behind the White Avalon and executed the traffic stop.   (Tr. 23:4-9, 95:6-9).

        After the White Avalon pulled over, Detective Hansen and Special Agent Kadan approached the car together, Detective Hansen on the driver side of the car and Special Agent Kadan on the passenger side.   (Tr. 95:24-25).   Neither officer had his gun drawn.   (Tr. 23:19).   Detective Hansen asked the defendant for his license and registration. (Tr. 96:24).   Barreras produced a New York driver's license but could not find a registration, even after he was given an opportunity to look in the glove compartment.   (Tr. 97:1-19).   Barreras appeared extremely nervous: Detective Hansen noticed that his hands were shaking and could see that a vein in his neck was enlarged and pulsing. (Id.).

---

Hansen acknowledged on the witness stand, his recollection of when he first noticed that Barreras was not wearing a seatbelt "varied over time."  (Tr. 128:2).
    There was also an inconsistency in the testimony of Special Agent Kadan and Detective Hansen as to whether Special Agent Kadan and Detective Hansen discussed the seatbelt before they pulled the car over.  Detective Hansen remembered Special Agent Kadan pointing out that Barreras was not wearing a seatbelt immediately before pulling the car over.  (Tr. 94:18).  Special Agent Kadan did not recall discussing the seatbelt with Detective Hansen.  (Tr. 21:21-22)
    The fact that the agents did not recall some details related to the seatbelt is unsurprising.  They considered the seatbelt to be unimportant because they decided to stop the White Avalon based on suspicion of criminal activity, not because of a traffic violation.  (Tr. 80:22-81:1, 102:25-103:10).

Detective Hansen asked Barreras whose car it was. (Tr. 97:19-20). Barreras told him the car belonged to Julio Rodriguez and that Julio Rodriguez knew he had his car. (Tr. 97:23-25). Detective Hansen asked Barreras what kind of work he did. (Tr. 98:22-23). Barreras responded that he worked in computers, and as he listened to the question, glanced towards an orange bag that Detective Hansen had noticed in the back seat of the car. (Tr. 26:16-17, Tr. 98:24-25).

Detective Hansen asked him what was in the bag, to which the defendant replied: sneakers. (Tr. 99:2-3). Detective Hansen asked Barreras if he could look in the bag. (Tr. 99:15-16). Barreras responded that he could and said that the bag was not his. (Tr. 99:17). Detective Hansen moved around the car to the passenger's side, (Tr. 99:25), and as he did, Special Agent Kadan asked the defendant to shut the car off. (Tr. 26:23-27:4, Tr. 100:16). Detective Hansen opened the passenger door, reached in, pointed at the orange bag and asked again if he could search the bag. (Tr. 99:25-100:2). Barreras again said he could search the bag and that the bag was not his. (Tr. 100:2).

Detective Hansen picked the bag up and placed it on the seat. (Tr. 100:6-7). As he did, he remarked that the bag seemed heavy for sneakers. (Tr. 100:3-5). When Detective Hansen placed the bag on the seat, a white t-shirt that was covering the contents of the bag moved, and Detective Hansen could see what he

6

believed to be wrapped packages of cocaine.[5]  (Tr. 100:8-13).
Detective Hansen signaled to Special Agent Kadan that Barreras
should be placed under arrest.  (Tr. 100:22-25).

Immediately after being placed under arrest, Barreras
was informed of his Miranda rights.  (Tr. 27:3, Tr. 100:25-
101:2).  Special Agent Kadan read the rights from a card he
carried with him.  (Tr. 28:3-4, Tr. 101:1-2).  Barreras made
several statements after his arrest.  (Tr. 167:21-168:22).  He
initially claimed he had not known that there were drugs in the
car.  (Tr. 167:25-168:1).  He later claimed that he had stolen
the car from the parking lot behind 808 Tuckahoe Road.  (Tr.
168:18).[6]

### B.    The Defense Case

Barreras testified on his own behalf and was the only
defense witness.  Barreras testified that, before his arrest, he
supported himself though a business focused on novelties and
gifts.  (Tr. 130:11).  Barreras alternatively described the
business as an internet business and a mail order catalog
business, (Tr. 130:8-10), but said that it involved using a
computer, (Tr. 130:14), and that it had a website with the

---

[5] A lab test later confirmed that the packages did, in fact,
contain 5 kilograms of cocaine.

[6] Special Agent Kadan testified that Barreras stated he had
stolen the car from the parking lot behind 790 Tuckahoe Road.
(Tr. 168:14-18).  790 and 808 Tuckahoe Road share the same
parking lot.

internet address "Noveltiesngifts.com", (Tr. 166:15). The
defendant testified that he was the owner and sole proprietor of
the business, (Tr. 166:16-19), and that the business filed tax
returns, (Tr. 163:2-3), but he could not remember what year the
business started, (Tr. 161:21-162:1), or how much it had made in
any given year, (Tr. 162:17-23).

Barreras testified that he had been offered $2,500 by
Fernando Sanchez ("Sanchez"), (Tr. 148:15), to bring a bag of
cocaine from an apartment in White Plains to a restaurant in the
Bronx, (Tr. 149:19-20). According to Barreras's testimony,
Sanchez was someone "who lived in the neighborhood" where
Barreras lived. (Tr. 157:14). Barreras arranged to meet Sanchez
at the apartment of Julio Rodriguez ("Rodriguez"), on the night
of July 23, 2007. (Tr. 160:5-8). When Sanchez arrived carrying
the drugs, Rodriguez opened the door for Sanchez. (Tr. 161:7-9).
Sanchez gave the drugs to Barreras in the apartment. (Tr.
160:13). Barreras took the drugs, packed in an orange bag, to
Rodriguez's car, the White Avalon, which he had pre-arranged to
borrow from Rodriguez. (Tr. 158:20).

Barreras testified that he put the orange bag in the
back seat of the car, put on his seatbelt and started to back out
of his parking space, but had to wait while a car passed behind
him. (Tr. 132:19-134:3). He then exited the parking lot, turned
onto Tuckahoe Road and drove to the intersection of Tuckahoe Road

and Central Avenue, where he waited in the left-turn lane.  (Tr. 134:14-135:24).

As Barreras started to make the turn onto Central Avenue, he was pulled over.  (Tr. 136:9-22).  Two officers that he later learned to be Detective Hansen and Special Agent Kadan approached his car.  (Tr. 137:8-138:1).  Detective Hansen came to the driver's side of the vehicle and asked him if he knew anyone that drove a black car that parked in the area.  (Tr. 138:3-7). Barreras said that he did not.  (Tr. 138:9).

Detective Hansen then asked him for his license, which Barreras handed to him.  (Tr. 138:11-12).  As Barreras handed over his license,  Detective Hansen asked whether Barreras owned the car.  (Id.).  Barreras said that the car belonged to Julio Rodriguez and asked if he could get the registration out of the glove compartment.  (Tr. 138:12-15).  Barreras looked in the glove compartment and found the registration; when he looked up, Detective Hansen had moved around the car to the passenger side, and was asking him about the orange bag.  (Tr. 138:17-139:2).  At that point, Special Agent Kadan asked Barreras to shut the car off.  (Tr. 139:10).  Once Barreras complied, Detective Hansen opened the car door, picked up the bag, and looked inside.  (Tr. 139:12-14).  Barreras testified that he never gave consent to search the bag.  (Tr. 140:12-14).

Barreras testified that he was not read his <u>Miranda</u>
warnings until he was taken to the precinct.  (Tr. 145:15).  He
also testified that he did not make any statements after being
arrested.  (Tr. 156:18-20).


**ARGUMENT**

## I.   THE GOVERNMENT'S WITNESSES WERE CREDIBLE

The testimony of the Government's witnesses and the
testimony of the defendant were contradictory on several material
points.  The Court, as finder of fact, should find the
Government's witnesses were credible.

The two witnesses presented by the Government each
explained, in detail, the context surrounding the stop of the
White Avalon, the search of the orange bag, and the arrest of
Barreras.  Both of the witnesses was internally consistent and,
moreover, consistent in all material ways with each other.  Both
agents testified that Detective Hansen asked Barreras what was in
the bag, and that the defendant replied "sneakers."  (Tr. 26:7-9;
99:2-3).  Both testified that after picking up the bag, Detective
Hansen remarked that the bag seemed "kind of heavy for sneakers."
(Tr. 27:6-7; Tr. 100:3-5).  Both testified that Special Agent
Kadan read Barreras his Miranda rights off of a DEA Miranda card
moments after Barreras was placed under arrest.  (Tr. 28:3-4; Tr.
101:1-2).

10

The testimony given by the Government witnesses also
makes sense.  The focus of DEA Agents' investigation was the
suspect that had escaped arrest earlier in the day.  With that
objective in mind, they stopped the White Avalon because they
reasonably suspected that it might be somehow related to that
investigation.  It was only after stopping Barreras's car,
realizing that the defendant was not the owner of the vehicle and
could not locate the registration, and noticing that he was
extremely nervous, that the agents focused on the orange bag.
Even then it was only after observing Barreras glancing at the
orange bag in the back seat that Detective Hansen asked if he
could search the bag.  The sequence of events described by both
of the Government's witnesses fits with the nature of the
investigation that evening; the agents were focused on the
identity of the driver and finding out if there was a connection
between the driver of the car and their investigation.

## II.  BARRERAS WAS NOT CREDIBLE

Barreras's testimony was both incomplete and rife with
incredible assertions.  His testimony should be disregarded as
not credible.  Barreras initially testified that he was carrying
drugs on the night of July 23, 2007, but failed to offer any
explanation as to where he got the drugs and what he was doing
with them.  Barreras only elaborated on this incomplete testimony
grudgingly, when forced to on cross-examination by both the

11

Government and the Court.  When he did, his account was still unsatisfying and became less believable: Barreras explained that he was being paid $2,500 simply to bring a bag of cocaine from an apartment in White Plains to a restaurant in the Bronx by someone he just knew from around his neighborhood.  It is absurd to suggest that someone who did not work with Barreras in the drug trade would suddenly agree to pay him $2500 just to drive a package of cocaine to a location a few miles away.

Barreras's account is rendered even more incredible by his description of the role of his friend Julio Rodriguez ("Rodriguez") in the transaction.  Clearly trying to cover for Rodriguez, Barreras claimed that Rodriguez knew nothing about the drug delivery despite admitting that: the drugs were delivered to Rodriguez's apartment while Rodriguez was there, that Rodriguez opened the door for the person delivering the drugs, and that Rodriguez lent Barreras the car he used to transport the drugs. Given these facts, it would require a complete suspension of disbelief to accept that Rodriguez did not know anything about the drug transaction.  Barreras's attempt to deny Rodriguez's role in the drug transaction further exposes his testimony as unbelievable.

The defendant's testimony about his business was similarly lacking in detail and difficult to believe.  Barreras originally testified simply that he supported himself by running

an internet business focused on novelties and gifts.  On cross-examination, Barreras admitted that, despite claiming that he ran the business, he could not remember when the business started or how much it had made in any given year, even very recent years. Again, it defies common-sense that Barreras would not know when his business started and how much it made.  This is particularly true because, as the owner and sole proprietor, Barreras is responsible for signing the business's tax return each year.

The contrast between the testimony of the Government's witnesses and the testimony of the defendant could not be more stark.  While the testimony by the Government's witnesses was both detailed and made sense, Barreras's testimony lacked detail and was full of assertions that cannot be believed.  The Court should find make a credibility finding in favor of the Government and conclude, not only that Barreras was not a credible witness, but that he lied repeatedly when he made statements that directly contradicted the testimony given by the Government's witnesses.

## III. THE STOP OF THE WHITE AVALON WAS LAWFUL

Barreras claims that the stop of the White Avalon on July 23, 2007 was unlawful because the DEA Agents were not aware of any criminal or suspicious conduct that would justify the stop.  See Barreras Pretrial Mot. at 7.  Barreras also claims that because he was wearing a seatbelt while driving the White Avalon that evening, see (Tr. 133:8), there was no evidence of a

13

vehicle and traffic violation prior to the stop, Barreras
Pretrial Mot. at 6.

The evidence at the hearing established that there were
specific and articulable facts that gave rise to reasonable
suspicion that the driver of the White Avalon was involved in
criminal activity.    Additionally, the evidence at the hearing
established that DEA Agents observed that the driver of the White
Avalon was not wearing a seatbelt moments before they stopped the
car.  This observation gave rise to reasonable suspicion of a
traffic violation and was an independent basis for the stop.[7]

A.    **The Stop Was Justified By Reasonable Suspicion of
      Criminal Activity**

      1.    **Applicable Law**

A police officer may conduct a brief "investigative
detention" or "Terry stop" by stopping a person to investigate
possible criminal behavior, as long as at the time the officer
effects the stop, the officer has "'reasonable suspicion' to
believe that criminal activity has occurred or is about to
occur." United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995)
(citing United States v. Glover, 957 F.2d 1004, 1008 (2d Cir.
1992)).  An investigative stop of an automobile is such a stop

---

[7] Because there was no evidence at the hearing to support
Barreras's assertion in the Suppression Motion that DEA agents
exhibited unreasonable force during the stop, see Barreras
Pretrial Mot. at 9-10, any contention that Barreras was placed
under defacto arrest should be rejected.

and is constitutional if based on reasonable suspicion.  See
United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007).

Reasonable suspicion arises when law enforcement
officers are "aware of specific articulable facts, together with
rational inferences from those facts, that reasonably warrant
suspicion."  United States v. Brignoni-Ponce, 422 U.S. 873, 884
(1975).  The test for reasonable suspicion is "rather lenient,"
United States v. Santana, 485 F.2d 365, 368 (2d Cir. 1973), and
is "not a difficult one to satisfy."  United States v. Oates, 560
F.2d 45, 63 (2d Cir. 1977).  "Reasonable suspicion" is measured
by an objective test, Glover, 957 F.2d at 1010, reviewing the
circumstances as a whole from the perspective of a law
enforcement officer, United States v. Barlin, 686 F.2d 81, 86 (2d
Cir. 1982).  The reasonable suspicion analysis "does not deal
with hard certainties, but with probabilities," and properly
takes into account that trained law enforcement agents may make
observations and draw conclusions that go beyond the capacity of
a lay person.  United States v. Cortez, 449 U.S. 411, 418 (1981);
see also Ornelas v. United States, 517 U.S. 690, 699-700 (1996)
(while ultimate review of reasonable suspicion determination is
de novo, deference should be given to experience of police
officers involved).

Reasonable suspicion may be based on a variety of
factors, including an individual's presence in a high-crime

neighborhood, "nervous, evasive behavior," and "unprovoked flight upon noticing the police." Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Welbeck, 145 F.3d 493, 498 (2d Cir. 1998) (stop justified by, inter alia, defendant's "evident alarm and evasive behavior" after being alerted to police presence"). In short, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Wardlow, 528 U.S. at 125.

> **2.    The Facts Justified The Agents' Reasonable Suspicion of Criminal Activity**

The evidence at the February 28, 2008 hearing established that the DEA Agents were aware of specific and articulable facts that, when viewed together with reasonable inferences from those facts, reasonably warranted suspicion of criminal activity.

At its core, the decision to conduct the traffic stop was based on two sets of facts: the location of the White Avalon and the behavior of its driver. The White Avalon was spotted sitting with its motor running and its lights on, at night, in the parking lot of a building that was both the residence of an individual who was the target of a DEA manhunt and the location from which the same individual had fled on foot. This location was particularly important to the DEA Agents because their experience taught them that suspects who are on the run

frequently come back to the place they live once they believe that law enforcement has left the location. (Tr. 17:17-21).

The location of the White Avalon took on added significance because of the behavior of its driver. Barreras stared at Detective Hansen both times he drove past the White Avalon. Detective Hansen, who was driving a car that was frequently identified as a police car, could have reasonably inferred that Barreras's intense interest in the police was related to criminal activity. Further, the White Avalon started to back out of the parking lot once Detective Hansen drove by, but stopped when Detective Hansen turned his car and began to drive back toward it. This behavior could also be reasonably viewed as furtive. Barreras seemed to be trying to avoid detection by Detective Hansen.

Given the location of the car and behavior of the driver, there was ample reason to suspect that the White Avalon was linked to the target of the DEA manhunt. It was sitting in the parking lot of a building where the target of the investigation lived and where the DEA suspected he might return later that night. The car appeared to be both waiting for someone and acutely aware of Detective Hansen when he entered the parking lot. Even once Special Agent Kadan determined that the driver of the White Avalon was not the target of the investigation, there was still reason to think that the target

17

might be hiding in the car, or that the driver might know where the target of the investigation was.

It is well-established that the combination of a location linked to criminal activity and furtive behavior can be sufficient to support a finding of reasonable suspicion. See Wardlow, 528 U.S. at 124. In Wardlow, the Supreme Court upheld a finding of reasonable suspicion based solely on those two factors when they upheld an investigative stop after an individual in a high-crime area fled when officers approached. The facts supporting reasonable suspicion here are stronger. Instead of simply encountering the White Avalon in a high-crime area, as the police did in Wardlow, here the DEA Agents had specific information tying 808 Tuckahoe Road to an ongoing investigation. Instead of simply seeing a subject fleeing from the scene and having to make a snap judgment about whether to execute a stop, as the police did in Wardlow, here Detective Hansen was able to watch Barreras for several minutes and consult with another law enforcement officer before deciding to execute a stop.

When viewing the circumstances on the evening of July 23 in their totality, as is required under the reasonable suspicion inquiry, and considering how these circumstances would have been viewed by trained law enforcement officers, suspicion that the White Avalon was involved in criminal activity was

18

warranted.  The traffic stop was lawful based on reasonable suspicion of criminal activity.

### B. The Stop Was Justified by a Violation of New York's Vehicle and Traffic Laws

While the stop of the White Avalon was justified by reasonable suspicion of criminal activity based on the behavior of the White Avalon and its driver, there was also reasonable suspicion of criminal activity based on the DEA Agents' observation that Barreras was not wearing a seatbelt.  A violation of vehicle and traffic laws ("VTL") may give rise to a valid stop under the Fourth Amendment whenever the officers have probable cause or a reasonable suspicion, based on specific and articulable facts, of such an infraction.  United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994).[8]

The constitutionality of traffic stops based on VTL infractions are assessed under a "wholly objective 'authorization' test," according to which a stop will be deemed valid as long as the officer possessed legal authority in State or municipal law to conduct it.  Id. at 783.  "[T]he 'actual motivations of the individual officers involved' in the stop

---

[8] Pursuant to New York Vehicle and Traffic Law, Section 1229-c (3), "[n]o person shall operate a motor vehicle unless such person is restrained by a safety belt . . . ."

19

'play no role' in the analysis." Holeman, 425 F.3d at 190 (quoting Whren v. United States, 517 U.S. 806, 813 (1996)).[9]

In this case, Agent Kadan saw clearly that the driver of the White Avalon was not wearing a seatbelt before the DEA Agents stopped the car. While it is undisputed that the DEA Agents did not stop the White Avalon because of the observed traffic violation, the fact that they were aware that the defendant did not have a seatbelt on was a sufficient basis for the investigative stop under the objective authorization test, Holeman, 425 F.3d at 190; Scopo, 19 F.3d at 782, and is an independent basis for finding that the stop of the White Avalon was lawful.[10]

## IV.  THE SEARCH OF THE ORANGE BAG WAS LAWFUL

Barreras claims that the drug evidence found in the White Avalon should be suppressed because he did not give consent to the DEA Agents to search the orange bag that contained the

---

[9] Because the standard applied is objective, in assessing a stop based on a VTL infraction, it does not matter whether the stop is pretextual. Holeman, 425 F.3d at 190 n. 1; see also Scorpo, 19 F.3d at 783. "[A]n observed traffic violation legitimates a stop even if the detectives do not rely on the traffic violation." United States v. Dhinsa, 171 F.3d 721, 725 (2d Cir. 1998); see also Holeman, 425 F.3d at 190.

[10] Barreras claims that he was wearing a seatbelt when he operated the White Avalon. For the reasons discussed above, see Part II infra, Barreras should be deemed not to be credible and his testimony should be disregarded.

cocaine.  Barreras Pretrial Mot. at 12.  Barreras voluntarily consented to the search; his argument should be rejected.

"It is ... well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); see also Florida v. Jimeno, 500 U.S. 248, 250-51 (1991) ("we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so" (internal citation omitted)).  Consent, which may be express or implied, is a voluntary waiver of Fourth Amendment rights, and waiver need not necessarily be knowing and intelligent. Schneckloth, 412 U.S. at 235, 241; United States v. Garcia, 56 F.3d 418, 422-23 (2d Cir. 1995).[11]

To determine whether consent was voluntarily given, courts examine the totality of the circumstances surrounding the consent. Schneckloth, 412 U.S. at 227; Anobile v. Pelligrino, 303 F.3d 107, 124 (2d Cir. 2004).  The factors used to determine whether express consent is voluntary include the individual's knowledge of his right to refuse consent, his age, his intelligence and education, the length and the nature of

---

[11]  Accordingly there is no requirement that law enforcement officers advise a defendant of his right to refuse consent, or of the possible consequences of a search, prior to seeking consent. Garcia, 56 F.3d at 422-23.

21

questioning, or the presence of coercive police behavior.
Schneckloth, 412 U.S. at 226-27.[12]  Generally, no one factor will
be sufficient on its own to merit a finding of involuntariness.
See id.

The evidence at the hearing showed that Barreras
consented to the search of the orange bag.  Detective Hansen
asked Barreras twice if he could look in the bag.  First, when he
initially noticed the bag, then a second time after he moved
around the car.  Both times Barreras said yes.

Barreras's consent was knowing and voluntary.  Barreras
is 39 and was certainly aware of his right to refuse to give
consent to the search; he had successfully challenged a search in
New York State court based on a determination that the officer
who executed the search had failed to adequately obtain his
consent.  (Tr. 152:15-18).  The questioning by the officers
before the search was brief and limited to basic information
about the defendant and the car he was driving.  The officers did
not coerce Barreras in any way, nor did they say anything to make

---

[12] The fact that a defendant was not given Miranda warnings
prior to giving consent to search is insufficient, without more,
to render his consent involuntary.  See United States v. Moreno,
897 F.2d 26, 33 (2d Cir. 1990); see, e.g., Garcia, 56 F.3d at
422-23 (Miranda warnings not required, though absence of Miranda
warnings "may be a factor" for consideration).

the defendant believe he was under arrest before asking for consent to search.[13]

Because credible testimony established that Barreras knowingly and voluntarily consented to the search of the orange bag, the search was lawful. The evidence seized from the bag should not be suppressed.[14]

_____

[13] While the DEA Agents did not read Barreras his <u>Miranda</u> rights before obtaining his consent to search the orange bag, as noted above, this factor is not sufficient to make his consent involuntary, given that all the other considerations suggest that the consent was knowing and voluntary.

[14] Having established that both the traffic stop and the subsequent search were lawful, any contention that statements made to law enforcement following his arrest should be suppressed should be swiftly rejected. <u>See</u> Barreras Pretrial Mot. at 14. The evidence at the hearing established and that the defendant was read his <u>Miranda</u> rights immediately after his arrest and before making any statements to law enforcement officers.

23

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's Suppression Motion in its entirety.

Dated:    White Plains, New York
          March 31, 2008

                    Respectfully submitted,

                    MICHAEL J. GARCIA
                    United States Attorney for the
                    Southern District of New York

                    By:  _____
                    Nicholas L. McQuaid
                    Assistant United States Attorney
                    (914) 993-1936

24

## AFFIRMATION OF SERVICE

NICHOLAS L. McQUAID, pursuant to Title 28, United States Code, Section 1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York.  That, on March 31, 2008, I caused copies of The Government's Post-Hearing Submission in Opposition to Defendants' Pretrial Motion to be delivered by ECF and Federal Express to:

> Lawrence M. Fisher
> 350 Broadway
> 10th Floor
> New York, NY 10013

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:    White Plains, New York
          March 31, 2008


_____
Nicholas L. McQuaid