UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――

UNITED STATES OF AMERICA

v.

07 CR. 822 (SCR)
DECISION AND ORDER

HECTOR BARRERAS
―――――――――――――――――――

**STEPHEN C. ROBINSON, United States District Judge:**

The Defendant, Hector Barreras, was indicted on one count of conspiring to violate 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A) by distributing and possessing with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846.

The Defendant seeks an order suppressing evidence seized and statements allegedly made following his arrest after a vehicle stop on July 23, 2007. On February 28, 2008, the Court held a hearing on the suppression motion. At the hearing, two Drug Enforcement Administration Taskforce officers, Special Agent Kadan and Detective Hansen ("the DEA agents"), testified on behalf of the Government, and the Defendant testified on his own behalf. For the following reasons, the Defendant's motions to suppress are DENIED.

I. Facts

   a. Background

On July 23, 2007 in Yonkers, New York, the Drug Enforcement Administration was investigating an individual they suspected of narcotics trafficking, Eric Zak. (Hearing Transcript [Hereinafter "Tr."] at 16.) When they began to approach the car

1

driven by Zak, he sped off, striking an agent's car and a parked car before totaling his car and fleeing on foot. (Tr. at 16.) DEA task force officers launched a search for Zak with the help of local law enforcement. (Tr. at 16.) Detective Hansen, who was among those involved in the manhunt, was called to the area of the building believed to be Zak's residence, 808 Tuckahoe Road in Yonkers, New York. (Tr. at 15-18, 83-84.)

While at that location, Detective Hansen noticed a white Toyota Avalon parked in the parking lot behind the house. (Tr. at 86.) A man later identified as the Defendant, Hector Barreras, was sitting in the driver's seat. (Tr. at 86.) Detective Hansen was driving a car that was commonly recognized as an unmarked police vehicle. (Tr. at 86.) When Detective Hansen pulled into the parking lot, he noticed that the lights were on and the motor was running, and that Barreras stared at him. (Tr. at 87-88.) Detective Hansen further testified that after he turned around at the back of the parking lot and pulled back towards the exit of the lot, Barreras was still staring at him and had turned his head to look over his shoulder to see where the Detective's car went as he drove by. (Tr. at 88.) Detective Hansen testified that he "couldn't understand why is this guy looking at me so hard." (Tr. at 88.) Detective Hansen also noticed that when he pulled into the parking lot, Barreras backed out about 5 feet out of the parking space, but as he pulled out of the parking lot, Barreras pulled forward back into the space. (Tr. at 88.) Detective Hansen thought the driver of the Avalon may have been the suspect, Eric Zak, or may have been someone involved with Zak. (Tr. at 89.)

Detective Hansen pulled out of the lot, turned off his lights and parked so that he could continue to watch the white Avalon without being seen. (Tr. at 88.) When the Defendant drove out of the lot moments later, Detective Hansen decided to follow the car

2

and pull it over. (Tr. at 88-89, 92-93.) He started to follow the car, but saw Special Agent Kadan, another DEA Taskforce Officer working the investigation, on the side of the road and stopped to pick him up. (Tr. at 18-19, 92.) Detective Hansen explained what he had seen in the parking lot and that he wanted to pull the driver over because he suspected that the driver was connected to the investigation. (Tr. at 18, 93.) Agent Kadan thought they should wait to pull him over because even if Zak himself was not in the car, he thought that the driver might lead them to where Zak was located. (Tr. at 19.) At Detective Hansen's suggestion that they stay in the area of the residence, their assigned location, the agents decided to pull the Defendant over and see who was in the car, what information the Defendant might give them about the suspect, and where an interview might lead. (Tr. at 19, 93.)

According to Agent Kadan and Detective Hansen, Detective Hansen pulled up next to the white Avalon, and Agent Kadan looked at Barreras and observed that he was not the person that had struck his car earlier. (Tr. at 22, 94.) Kadan also noticed that Barreras was not wearing a seatbelt. (Tr. at 22, 94.) Detective Hansen also testified that he had noticed Barreras was not wearing the seatbelt, but he could not recall exactly when he observed it. (Tr. at 101.) The Defendant testified, however, that he was indeed wearing a seatbelt. (Tr. at 133.)

The agents stopped the Defendant's car and approached the vehicle together. (Tr. at 23, 95.) Neither had his weapon drawn. (Tr. at 23.) Detective Hansen, who was on the driver's side of the vehicle, asked the Defendant for his license and registration. (Tr. at 95-96.) The Defendant produced a New York State driver's license but, according to the DEA agents, was unable at the time to locate the registration, even after looking in the

3

glove compartment (Tr. at 25, 97).[1] Detective Hansen asked the Defendant who owned the car, and Barreras responded that Julio Rodriguez owned the car and knew that Barreras had it. (Tr. at 97.)

When Detective Hansen asked what kind of work Barreras did, the Defendant answered that he worked in computers and glanced towards an orange bag in the back seat of the car. (Tr. at 26, 98.) When Detective Hansen asked what was in the bag, the Defendant replied "sneakers." (Tr. at 26, 99.) According to Special Agent Kadan and Detective Hansen, Detective Hansen then asked Barreras if he could look in the bag and Barreras said yes. (Tr. at 26, 99.) Both Special Agent Kadan and Detective Hansen also testified that when Detective Hansen walked around to the rear door of the car where the bag was located, he again asked Barreras whether he could look in the bag and Barreras again replied yes, this time stating that the bag was not his. (Tr. at 27, 99-100.) Barreras contends that he never told the agents that they could search the bag. (Tr. at 140.)

When Detective Hansen opened the bag, he found what he correctly believed to packaged cocaine. (Tr. at 100.) At that point, both agents went to the driver's side door and placed the Defendant under arrest. (Tr. at 27, 100.) According to both agents' testimony, Special Agent Kadan immediately thereafter read the Defendant his *Miranda* rights off of a card he carries. (Tr. at 27-28, 100-01.) The Defendant denies having been advised of his rights until after he was brought to the police precinct. (Tr. at 145.) The Government alleges that the Defendant made several statements after his arrest, including that he had not known that there were drugs in the car (Tr. at 167-68) and later that he

---

[1] The Defendant testified that he found the registration in the glove compartment but held it in his hand until the arrest because Detective Hansen had moved away from the driver's window to the passenger side (Tr. at 163-64.)

4

had stolen the car from Julio Rodriguez. (Tr. at 168.) Barreras denies making any post-arrest statements whatsoever. (Tr. at 156.)

The Defendant testified that the reason he had cocaine in the car was that he had been offered $2,500 by Fernando Sanchez to transport the cocaine to a restaurant in the Bronx. (Tr. at 149.) Barreras met Sanchez at Julio Rodriguez's apartment at 790 Tuckahoe Rd. on the night of his arrest. (Tr. at 159-60.)[2] Sanchez came to the apartment with the drugs and handed them over to Barreras, who took them to Rodriguez's car, which he had arranged to borrow in order to transport the cocaine. (Tr. at 160-61.) Barreras further testified that he was stopped and arrested by Special Agent Kadan and Detective Hansen after leaving the parking lot behind Sanchez's apartment with the drugs. (Tr. at 160-161.)

The Government also presented a video tape which documents certain aspects of the Defendant's arrival at the apartment building and the movements of both the white Avalon and Detective Hansen's vehicle in the parking lot behind the building.

### b. Disputed facts

The testimony of the government witnesses and the Defendant differed regarding several material issues, including whether Barreras was wearing a seatbelt, whether he answered in the affirmative when the agents asked to search his bag, and whether he was given *Miranda* warnings at the time of his arrest. After hearing each witness's testimony, the Court finds that the DEA agents were credible, while the Defendant was not.

The Defendant contends that the video produced during the course of the hearing "clearly demonstrates" that there was a person wearing a white t-shirt in the passenger

---

[2] That apartment shared the parking lot with Eric Zak's apartment at 808 Tuckahoe Rd.

5

seat of Detective Hansen's vehicle when he did a k-turn in the parking lot. (Def. Post-Hearing Brief at 11.) The Defendant maintains that this person must have been Special Agent Kadan and that both Special Agent Kadan and Detective Hansen were lying when they consistently indicated in each of their testimony and the DEA report that Agent Kadan got in the car *after* Detective Hansen left the parking lot. The Defendant contends that due to their alleged fabrications on this issue, the Court should discredit the agents' testimony.

The Court's review of the video tape, however, does not support the Defendant's assertion. In the portion of the video the Defendant refers to, a flash of white appears at the passenger side window. It is far from clear, however, that this flash of white was a person wearing a white t-shirt, or, moreover, a person at all. Indeed, it appears to this Court that what the Defendant refers to is merely a reflection of light on the passenger side window. Regardless, it is far from clear as the Defendant maintains that a person wearing a white t-shirt was sitting in the passenger seat, and the Court sees no reason whatsoever to deduce from a flash of indeterminate light that both DEA agents were lying when they testified that they were apart until after Detective Hansen exited the parking lot. Instead, the Court finds the DEA agents' consistent accounts of how and when Detective Hansen picked up Agent Kadan to be credible.

Moreover, the Defendant's theory is illogical. Barreras seems to argue that the Government would prefer a version of events where Agent Kadan did not have an opportunity to see Barreras and determine whether he was the suspect until the traffic stop was executed because that is the only circumstance in which the stop would be justified. Accepting the Defendant's theory requires believing that Agent Kadan

6

falsified the DEA report and that both he and Detective Hansen lied under oath by telling accounts of events that were highly consistent and also completely fabricated in order to deceive the Court on this issue. The Defendant's theory, however, doesn't add up.

The Defendant is mistaken about the Government's argument, which is not that the purpose of the stop was purely to see if Zak was driving the Avalon, but rather to see if the driver of the Avalon was involved in Zak's criminal activity and had information regarding Zak's whereabouts. In fact, the Government acknowledges that Kadan knew that the white Avalon's driver was not Eric Zak before they executed the traffic stop. The Defendant is also incorrect to the extent that he presumes the stop would only be valid if the agents did not know the identity of the driver when they executed the stop. In this set of circumstances, that particular scenario is not necessary to give rise to reasonable suspicion.

The Court does, however, find it likely that *the Defendant* was lying when he testified as to his own role and that of Julio Rodriguez in the drug deal. Barreras testified that Fernando Sanchez, someone he was merely acquainted with from his neighborhood, paid him $2,500 simply to drive the cocaine from the apartment in Yonkers to a bar in the Bronx. It is quite difficult to imagine that someone who was merely acquainted with the Defendant and had not previously dealt with him in drug transactions would compensate the Defendant so highly for a task as simple as transporting the drugs a short distance from one place to another. The Defendant's testimony regarding the role his friend Julio Rodriguez played in the situation is also difficult to sustain. Barreras testified that Rodriguez had no knowledge of the drug delivery despite that the drugs were delivered to Rodriguez's apartment while Rodriguez was present, Rodriguez opened the door for

Sanchez when he delivered the drugs, and Rodriguez lent Barreras the white Avalon which he used to transport the drugs. Barreras's versions of these facts are unbelievable, and as a result this Court finds that the Defendant's testimony should not be credited.

### i. Whether the Defendant was wearing a seatbelt

The Court finds that the Defendant was not wearing his seatbelt prior to the traffic stop. Barreras claims that he was wearing his seatbelt, citing in support of his position the fact that he was not issued a traffic citation and that the DEA report regarding the Defendant's arrest does not mention the seatbelt violation. Yet the fact that no traffic citation was issued and that the DEA report doesn't include the seatbelt violation does not mean that no violation occurred. DEA agents do not normally issue traffic citations (Tr. at 46) and therefore it is unsurprising that they did not issue one in this case. In this situation, the absence of a ticket and notation in the report merely signifies that the seatbelt violation was not the DEA's central concern.

The Defendant also points to inconsistencies in the DEA agents' testimony regarding the seatbelt, including that Detective Hansen's recollection of when he first noticed that Barreras was not wearing his seatbelt changed over time and that Detective Hansen and Special Agent Kadan had differing recollections as to whether they had discussed the seatbelt before executing the traffic stop. There were no inconsistencies in their testimony about the agents' observations that Barreras was not wearing a seatbelt, however. Moreover, the inconsistencies that do exist are unsurprising, since the agents decided to stop the vehicle based not on the traffic violation but rather on their suspicion

that the vehicle and its occupants were related to the investigation of Zak. Thus, the Court credits the DEA agents' testimony that Barreras was not wearing his seatbelt.

### ii. Whether the Defendant told the DEA agents they could search

The Court also finds that Barreras did indeed answer in the affirmative when Detective Hansen asked to search the orange bag. Both DEA agents described in detail how Detective Hansen asked Barreras twice if he could look in the bag—first, while standing at the driver's side window when he first noticed the bag, and second after he walked around to the door where the bag was located. Both agents also testified that Barreras both times said yes and denied that the bag was his. The Defendant testified that Detective Hansen pointed to the bag and asked "what's that?," Barreras answered "that's my bag," and Detective Hansen immediately looked in the bag without ever obtaining Barreras's consent. For reasons discussed above, and because unlike Barreras's testimony the DEA agents' testimony was detailed and also consistent with one another, this Court credits their account of these events.

### iii. Whether the Defendant was given *Miranda* warnings following his arrest

The Court also credits the agents' testimony over that of the Defendant regarding the administration of *Miranda* warnings. Both Special Agent Kadan and Detective Hansen testified that Special Agent Kadan read the Defendant his rights off of a card he carries with him. Special Agent Kadan testified that the card is a DEA 13A *Miranda* waiver card, and that he read the rights in English because he knew from Barreras's

9

conversation with Detective Kadan and by asking Barreras directly that he spoke English well. Barreras maintains that he was not advised of his rights until later at the police precinct. The testimony elicited at the hearing establishes that the Defendant was indeed advised of his *Miranda* rights immediately after his arrest and prior to any statements he made to the agents.

### II. Motion to suppress

The Defendant maintains that the physical evidence seized from the car must be suppressed because both the stop and the search of the vehicle were unlawful. He contends that there was no reasonable suspicion to stop the vehicle, nor was there any traffic violation warranting the stop. He also asserts that his detention during the traffic stop was unreasonably prolonged. In arguing that the search was improper, the Defendant claims that he did not consent to the search. The Defendant also seeks suppression of statements made after the arrest, arguing that they are the fruit of an unlawful arrest and were elicited in violation of *Miranda*.

#### a. Physical Evidence
##### i. The Vehicle Stop

The temporary detention of individuals during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment and therefore must not be "unreasonable." *See Whren v. United States,* 517 U.S. 806, 809-10 (1996); *United States v. Harrell,* 268 F.3d 141, 148 (2d Cir. 2001). In order for a stop to be reasonable, an officer must have either probable cause or a reasonable suspicion of unlawful conduct based on specific and

articulable facts. *United States v. Gaines*, 457 F.3d 238, 243 (2d Cir. 2006). Probable cause and reasonable suspicion are judged by an objective standard and "are commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' As such, the standards are 'not readily, or even usefully, reduced to a neat set of legal rules.'" *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983)).

Reasonable suspicion exists when law enforcement officers are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion . . . ." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). The threshold for reasonable suspicion is not a high one, but must be based on "more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). A court assessing whether reasonable suspicion exists must consider the totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (quoting *United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977)). "In the case of a suspected drug transaction, . . . the reasonable suspicion inquiry must ask if the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." *Bayless*, 201 F.3d at 133 (quotations omitted).

In order for a stop to be reasonable, the stop must also be reasonably related in scope to the reason for the stop. *Terry*, 392 U.S. at 20. A lawful seizure can thus become

unreasonable if it is prolonged beyond the time reasonably required to serve the initial purpose of the stop. *See id.*; *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). An investigative detention may also ripen into an arrest and therefore require probable cause if "the officers unreasonably used means of detention that were more intrusive than necessary." *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993).

Testimony at the suppression hearing established that the DEA agents had a sufficient basis to stop the car based on a reasonable suspicion of criminal activity related to the suspect they were investigating. Barreras was in the parking lot that was the target location of the manhunt and was acting in a manner that led Detective Hansen to reasonably believe that he may have been involved with the subject of the investigation. Barreras's location was significant because the DEA agents were particularly focused on individuals in the area of the residence, including the parking lot, since in their training and experience, suspects who are on the run often return to their residences once they believe that law enforcement officials are no longer pursuing them. (Tr. at 17.) Barreras's behavior also contributed to creating a reasonable suspicion of unlawful conduct. Barreras stared down Detective Hansen, who was driving a car frequently identified as an unmarked police car, both times he drove by. Barreras had also started to back out of the parking space when Detective Hansen first drove by, but then pulled back into the space when Detective Hansen drove past Barreras again. In light of Barreras's intense scrutiny of Detective Hansen and his vehicle, which he knew is frequently identified as a police car, and Barreras's parking maneuver in the location central to the manhunt, Detective Hansen reasonably could have inferred that Barreras was attuned to police presence and trying to avoid attracting the attention of the police.

Considering the totality of the circumstances from the standpoint of a reasonable police officer guided by his training and experience, Barreras's behavior in connection with his location in the parking lot gave rise to a reasonable suspicion of criminal activity. It was reasonable to believe that the driver of the white Avalon may have been hiding Zak in the car or may have had information relating to Zak's whereabouts.

There is no dispute that the Defendant was formally placed under arrest once the officers found the cocaine. However, the Defendant claims that he was placed under de facto arrest prior to the search based on the conduct of the officers in making the stop. He also claims that the stop was unreasonably prolonged when the DEA agents asked to search the orange bag. Contrary to Barreras's claims, the scope of the detention here was reasonably limited in time and intrusiveness to the initial purpose of the stop. The means of detention used by the officers in the stop were minimally intrusive. They merely asked Barreras for his license and registration and shortly thereafter asked for consent to search a bag that the Defendant had nervously glanced at. No force was used, nor was there even a show of force. Hence the stop did not ripen into an arrest until he was formally placed under arrest. Nor was the detention unlawfully prolonged. Detective Hansen's request to search the bag was not a seizure within the meaning of the Fourth Amendment and therefore reasonable suspicion was not required to conduct the consent search. *See Muehler v. Mena*, 544 U.S. 93, 101 (2005); *Florida v. Bostick*, 501 U.S. 429 (1991).

A violation of vehicle and traffic laws may also give rise to a valid stop when officers have probable cause that such a violation has occurred. *See United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994). Indeed, "[w]hen an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." *Id.* at

782 (quoting *United States v. Cummins,* 920 F.2d 498, 500 (8th Cir. 1990)). Because the reasonable suspicion standard is objective, a traffic stop is valid if the officer possessed legal authority to conduct it, regardless of whether the stop was pretextual. *See Whren,* 517 U.S. at 812-13; *Holeman v. City of New London,* 425 F.3d 184, 190 n.1 (2d Cir. 2005). Indeed, neither the "actual motivations of the officers involved" nor their "subjective intentions" play any role in the analysis. *Whren,* 517 U.S. at 813.

Thus, the DEA agents also had a sufficient basis to stop the Defendant based on a traffic violation, since they saw that the Defendant was driving without his seatbelt prior to the stop of the vehicle. New York Vehicle and Traffic Law, Section 1229-c (3) mandates that "[n]o person shall operate a motor vehicle unless such person is restrained by a safety belt . . . ." Although the DEA agents did not stop the car in order to issue a traffic citation, they knew the Defendant was not wearing his seatbelt while driving and was therefore violating a New York State traffic law. Under the objective authorization test, this fact is sufficient to justify the stop, regardless of the agents' actual intentions, since they had the legal authority to conduct the stop.

### ii. The Search

Under the Fourth Amendment, a search conducted without a warrant is per se unreasonable unless the search falls within an established exception. *See Katz v. United States,* 389 U.S. 347, 357 (1967). One such exception occurs when a search is conducted pursuant to consent. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). When consent is the basis of a search, the Government bears the burden of demonstrating that consent was given voluntarily. *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968).

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (quotations omitted).

Factors to consider in making this objective determination include "the particularities of the situation that is presented in any given case and the possibly vulnerable subjective state of the person who consents[,] . . . [w]hether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent." *U.S. v. Lavan*, 10 F. Supp. 2d. 377, 384 (S.D.N.Y. 1998) (quotations and citations omitted). Personal characteristics of the defendant, such as age, education and experience, and the length of detention and the nature of questioning, should also be considered. *See Schneckloth*, 412 U.S. at 226. Mere acquiescence to police authority is not sufficient to prove consent. *Bumper*, 391 U.S. at 548-49.

Here, the Defendant gave knowing and voluntary consent for Detective Hansen to search the orange bag. Detective Hansen asked the Defendant twice whether he could search the bag. The first time, the Defendant said yes, and when asked what was in the bag, said "sneakers." The second time, the Defendant said yes and stated that the bag was not his. The fact that the Defendant was asked twice whether the Detective had permission to search the bag and the Defendant twice said yes is strong evidence that consent was given, particularly because there is no evidence of coercion. The agents did

not have their weapons drawn and there was no other show of force. There is nothing about the Defendant's age of 39 or the nature of the very brief and straightforward questioning that would lead the Court to conclude that consent was not knowing and voluntary. In fact, the Defendant clearly has knowledge of his right to refuse consent since he successfully challenged an allegedly consensual search in New York State court in 1998 on the basis that valid consent was not given. The Defendant also admits that based on this experience, he knew that he had the right to refuse Detective Hansen permission to search the orange bag. Thus, the Court finds that the search of the orange bag was lawfully executed with the Defendant's knowing and voluntary consent.

### b. Statements

As discussed above, the arrest in this case was lawful and the testimony at the suppression hearing establishes that the Defendant was properly informed of his *Miranda* rights following his arrest. Thus, any statements Barreras made following the arrest are admissible. It should be noted that while any post-arrest statements the Defendant made are admissible at trial, it is not necessary for the Court to decide whether Defendant actually made the alleged statements. The Defendant is free to argue to the jury at trial that he did not make the alleged statements.

### III. Conclusion

For the above reasons, the Court finds that the DEA agents had a sufficient basis to execute the traffic stop, the search was lawfully conducted pursuant to consent, and the Defendant was properly *Mirandized* following his arrest.

Therefore, the Defendant's motions to suppress the physical evidence and post-arrest statements are DENIED.

*It is so ordered.*

Dated: April 30, 2008
White Plains, New York

Stephen C. Robinson
United States District Judge